[L. A. No. 25140. In Bank. June 23, 1960.]

ACADIA, CALIFORNIA, LTD. (a Corporation) et al., Respondents, v. MONTAGUE HERBERT, Appellant.

Harry M. Fain, Gold, Needleman & Fain and J. Howard Sturman for Appellant.

Shaw & Barnett, William M. Shaw, Slaughter, Schlesinger & Schlecht, Warren E. Slaughter and James M. Schlecht for Respondents.

GIBSON, C. J.—Plaintiffs, Acadia, California, Ltd., and Anthony Burke, brought this action for damages and for declaratory and injunctive relief, alleging that defendant had ceased to comply with two agreements under which he was obligated to supply them with water essential to the use of

their lands and that his conduct was malicious. The jury, under instructions defining the meaning of the agreements, returned verdicts in favor of plaintiffs, awarding Acadia and Burke $5,753 and $8,000, respectively, as compensatory damages and $10,000 each as punitive damages. The court declared the rights of the parties in accord with its construction of the agreements and permanently enjoined defendant from interfering with the delivery of water under the contracts as so interpreted.

The two agreements were made in connection with sales of parts of a 40-acre tract of desert land which was uninhabitable without water. In 1946 the owners, Raymond Hatton and his wife, drilled a well and installed facilities for the pumping, storage, and distribution of water. The first agreement was made in 1949 when a portion of the tract, containing over an acre, was sold by the Hattons to predecessors of Acadia. In 1951 this parcel and the rights under the agreement were acquired by W. B. Milner and his wife, who transferred them to Acadia, a corporation wholly owned by the Milners. The second agreement was made in 1951 when a smaller parcel was purchased by plaintiff Burke. The Hattons thereafter sold the land which contained the well (apparently all the remainder of the acreage) to defendant, who assumed their obligations under the agreements.

It was provided in the agreements that water was to be supplied at gravity to each of the grantees for a certain monthly rental in such quantities as would be required for domestic use, including watering of gardens, but not to exceed "1/50 of such water as may be available from the existing water well" or any new well to be drilled by the grantor if the existing well became inoperative.[1] One of the disputed

---

[1]The material provisions of the agreements, which are substantially the same in both contracts, are here quoted from the Acadia agreement: "(1) Grantors agree and hereby undertake to furnish to the Grantees such water as may be necessary for domestic use consisting generally of the usual household and domestic uses and the adequate watering of ornamental plants, trees and shrubs, and household garden plots connected with the use, occupancy and development of the property of the Grantees hereinabove described as a residence, but not for any industrial, commercial or general agricultural purposes, and in no event to exceed 1/50 of such water as may be available from the existing water well on the real property hereinabove described, or any replacement well in lieu of the existing well as hereinafter provided for. (2) It is contemplated by the parties hereto that said portions of the said available water, not to exceed 1/50 thereof, will be adequate for the uses hereinabove permitted by the Grantors, but Grantors make no guarantee concerning the quantity of water agreed to be furnished, or concerning the continuing availability thereof, except

questions is whether the quoted phrase means 1/50 of the water available from the well when operated at full capacity or when operated with the particular pump in use at the time of each agreement.

The Hattons delivered water for irrigation at gravity, but they supplied water for household purposes under pressure, using a 500-gallon pressure tank and pipe lines, and this practice was continued by defendant. Early in 1953 plaintiffs expressed dissatisfaction with defendant's delivery of water, particularly with the pressure under which household water was supplied. As a result of negotiations, an additional 500-gallon pressure tank was installed on defendant's land, and the amount of the costs paid by him was provided by Milner as a prepayment of water rentals on behalf of Acadia. When the new installation was put into use the water pressure was improved, and delivery under increased pressure was continued for approximately two years.

In March 1955, after defendant started to subdivide his property and had built three new homes which he wished to provide with water from the well, he closed the pipe through

as hereinafter set forth. (3) Grantors agree and hereby undertake to maintain at their own expense the existing water well without representation as to the quantity of water therefrom, and further agree at their own expense to install such pipe lines, tanks and other facilities for the delivery of water to the premises of Grantees, as may be deemed reasonably necessary to supply to Grantees the amount of water herein undertaken to be supplied by the Grantors to the Grantees. The Grantors further agree at their own cost and expense, to maintain and operate the said facilities so long as it is reasonably possible to procure and distribute water from the water underlying the land of the Grantors. The Grantors further agree that should the existing well, for unforeseeable reasons sand up or become inoperative, and should it be reasonably possible in the opinion of water experts to drill a new producing well in lieu thereof, that the Grantors will, at their own cost and expense, drill such other well and place it in operation, if reasonably possible, in lieu of the existing well, and further at the Grantors' own cost and expense to install pipe lines, tanks and other facilities from said substitute well for the delivery of water to the premises of the Grantees. (4) The Grantees agree to pay to the Grantors for the water hereinabove agreed to be furnished, the sum of $7.50 per month during the first year during which said water is being furnished, and such additional sums as may be reasonable and proper considering any increase in operating expense of the Grantors, for such further year or years beyond the first year. . . . (5) Grantees further agree to receive said water at gravity at the property line of the Grantees and to make such provision for the transportation and use thereof upon the premises of the Grantees as the Grantees may desire in accordance with the permitted uses of this agreement and solely at Grantees' expense.''

The Burke agreement differs from the one quoted above in that the amount of water rental provided for in section (4) is $5.00 per month instead of $7.50.

which irrigation water had been delivered to plaintiffs at gravity and installed pressure-reducing devices on the pipe lines through which household water was furnished, thereby reducing the pressure to about 6 pounds per square inch. The generally accepted average pressure for delivery of water for household uses is 40 to 60 pounds per square inch. A preliminary injunction was granted directing defendant to restore service as it existed prior to March 1955. Defendant violated this order and was found to be in contempt, following a determination that his conduct had been wilful.

As we have seen, one of the disputed questions concerns the method of measuring the amount of water to which plaintiffs were entitled under the agreements. In this connection the court instructed the jury that each of the plaintiffs was entitled to the quantity of water reasonably necessary for domestic use, including watering of gardens, but not to exceed "1/50 of such water as may be available from the existing water well" and that the quoted phrase meant 1/50 of the amount of water that the well could produce when operated at full capacity.

When the various provisions of the agreements are considered together, it appears that the meaning of the quoted phrase is the one adopted by the court and that there was no issue relating to construction to submit to the jury. The pump in use, the capacity of which, according to defendant, was determinative of plaintiffs' rights, is nowhere mentioned in either of the agreements, and several provisions show that, if necessary, the grantees were to be supplied with water by means other than those existing at the time of the agreements. The phrase under consideration was immediately followed by the words "or any replacement well in lieu of the existing well as hereinafter provided for." The agreements provided further that the grantors would install "pipe lines, tanks and other facilities" reasonably necessary to supply the agreed amount of water, that they would operate those facilities "so long as it is reasonably possible to procure and distribute water from the water underlying the land of the Grantors," and that, if reasonably possible, they would drill a new well and install the necessary facilities if the existing well became inoperative. (Agreements, § (3).) Provision was also made for payment of higher water rentals by the grantees in case of increased operating expenses. (Agreements, § (4).)

Even if it be assumed that there is some ambiguity in the contracts, all evidence that could have any bearing on

the construction of the phrase in question is without dispute and leads to the same conclusion as that which arises from a consideration of the provisions of the agreements. At the time the agreement was made with the predecessors of Acadia, the well was equipped with a 25-horsepower pump which could draw 300 to 400 gallons of water per minute, and when Burke purchased his property, a pump of 7½ horsepower had been substituted, which had a capacity of 200 gallons per minute. The well could have produced 900 gallons of water per minute had it been operated at full capacity. When Acadia's property is fully developed, its average daily needs for water in certain months will be between nine and ten gallons per minute, and for use in peak hours a flow of 16 gallons a minute will be required. Thus, 1/50 of the total capacity of the well (18 gallons per minute) would provide Acadia with the necessary water, whereas 1/50 of the capacity of the pump in use when its contract was made (six to eight gallons per minute) would be insufficient for its needs. Development of the property of the grantees was anticipated in the agreement, and it would be unreasonable to assume that an inadequate amount of water would have been agreed to, particularly since the agreement recited that it "is contemplated by the parties hereto that said portions of the said available water, not to exceed 1/50 thereof, will be adequate for the uses hereinabove permitted." There is no indication or contention that the Burke agreement is to be construed differently from the Acadia agreement.

The court correctly instructed the jury that the agreements were modified so as to require defendant to deliver water for household purposes under reasonable pressure. Defendant, following the practice of the Hattons, had delivered water for those purposes under pressure for more than a year when plaintiffs became dissatisfied and entered into negotiations with defendant to increase the pressure under which the water was furnished. After a meeting of the parties at which Wright, an installer of water systems, suggested that another 500-gallon pressure tank be installed, Milner, on April 13, 1953, wrote defendant a letter reading in part: ". . . I will prepay to you up to approximately $1,000.00 of the water rentals Acadia California, Ltd. will be liable for. This is the amount which James E. Wright, Jr. estimates will be necessary to make such additions and adjustment to your existing plant to insure an adequate water supply." After a second tank was installed and defendant was billed for the

costs, he requested Milner to send a check. Milner complied, but the check was returned and further negotiations ensued. On February 6, 1954, Milner sent another check, stating that its acceptance would confirm the understanding that the delivery of water with the then existing facilities would be continued. Defendant cashed the second check and wrote to Milner that it was accepted upon the basis of the written agreement and Milner's letter of April 13, 1953, but he denied that his acceptance meant a modification of the written agreement.

Defendant's denial of an intention to modify the agreements when he accepted the check was ineffective. ■ Where something to which the offeree is not unconditionally entitled is tendered to him upon stated conditions and he exercises dominion over it, he is bound by the conditions even though he informs the offeror that he rejects them. When he can rightfully exercise dominion over the thing tendered only if he accepts the conditions, he will not be permitted to avoid them by asserting that his conduct was tortious. (See Rest., Contracts, § 72, subsec. 2, and comment b; 6 Williston on Contracts (rev. ed. 1938), § 1856; cf. *Edgar* v. *Hitch*, 46 Cal.2d 309, 311 [294 P.2d 3]; *Grayhill Drilling Co.* v. *Superior Oil Co.*, 39 Cal.2d 751, 753 [249 P.2d 21]; *Potter* v. *Pacific Coast Lumber Co.*, 37 Cal.2d 592, 597 [234 P.2d 16].) ■ Since the check was tendered on condition that the delivery of household water under pressure with the improved facilities would be continued so as to insure an adequate water supply for plaintiffs, defendant's acceptance of the check bound him to give the service for which the check was intended to be the consideration.

Defendant contends that errors were committed in the award of damages to plaintiffs. ■ In connection with this contention, it should be pointed out that plaintiffs could recover either in contract or in tort and that it is clear from the verdict that the recovery was based on tort. ■ An act that constitutes a breach of contract may also be tortious. (*Langley* v. *Pacific Gas & Elec. Co.*, 41 Cal.2d 655, 662 [262 P.2d 846]; *Jones* v. *Kelly*, 208 Cal. 251, 255-256 [280 P. 942]; *Tooke* v. *Allen*, 85 Cal.App.2d 230, 236-237 [192 P.2d 804].) In the Jones case, which is factually similar to the present one, it was held that a good cause of action in tort was stated by a complaint alleging that the defendant leased the plaintiff a house together with a sufficient supply of water for the plaintiff's family and that during the tenancy the defendant wilfully and maliciously shut off the water supply. ■ Here

the jury was properly instructed that it could not award damages under both contract and tort theories, but must select which theory, if either, was substantiated by the evidence, and that punitive damages could be assessed if defendant committed a tort with malice or intent to oppress plaintiffs, but that such damages could not be allowed in an action based on breach of contract, even though the breach was wilful.

Since the jury awarded punitive damages, it impliedly found not only that defendant had committed a tort but also that he acted with malice or intent to oppress.

Burke was awarded damages for loss of his wife's services and for his own suffering and anxiety resulting from the effect on his wife of the shutting off of the water supply. The evidence showed that Mrs. Burke, who had suffered from a mental illness in 1954 but who early in 1955 was normal again, suffered a relapse in April 1955 caused by the shutting off of the water and that because of her relapse she received extensive medical treatment and hospitalization.

The jury was correctly instructed that if Burke was entitled to damages he should be awarded ''a sum that will compensate him reasonably for any loss of his wife's services that he has suffered as a proximate result of the defendant's conduct.'' (Code Civ. Proc., § 427; *Meek* v. *Pacific Electric Ry. Co.*, 175 Cal. 53, 56-57 [164 P. 1117]; *Martin* v. *Southern Pacific Co.*, 130 Cal. 285, 287 [62 P. 515]; *McKune* v. *Santa Clara V. M. & L. Co.*, 110 Cal. 480, 487 [42 P. 980]; *Tell* v. *Gibson*, 66 Cal. 247, 248-249 [5 P. 223]; see *Moody* v. *Southern Pacific Co.*, 167 Cal. 786, 789-790 [141 P. 388].) The instruction did not, as defendant urges, permit the jury to award Burke damages for loss of consortium, that is, for loss of noneconomic aspects of the marriage relationship such as society and companionship.

It was also proper to permit the jury to award damages to Burke for his mental suffering. It is settled that, regardless of whether the occupant of land has sustained physical injury, he may recover damages for the discomfort and annoyance of himself and the members of his family and for mental suffering occasioned by fear for the safety of himself and his family when such discomfort or suffering has been proximately caused by a trespass or a nuisance. (*Kornoff* v. *Kingsburg Cotton Oil Co.*, 45 Cal.2d 265, 271 et seq. [288 P.2d 507]; *Herzog* v. *Grosso*, 41 Cal.2d 219, 225-226 [259 P.2d 429]; *Anderson* v. *Souza*, 38 Cal.2d 825, 833 et seq. [243 P.2d 497]; *Judson* v. *Los Angeles Suburban Gas Co.*, 157 Cal.

168, 170-172 [106 P. 581, 21 Ann.Cas. 1247, 26 L.R.A. N.S. 183] ; *Alonso* v. *Hills,* 95 Cal.App.2d 778, 787-788 [214 P.2d 50] ; see Rest., Torts, § 929, clause (c) and comment g; Rest., Torts, § 47, subsec. (2), and comment c.) ■ Defendant's disruption of the water supply is closely analogous to a trespass or a nuisance in that it interfered with the use and enjoyment of the land by Burke and his wife, and such conduct warrants imposition of liability for mental distress of the occupants, at least where, as here, the tortious acts are wilful. The jury impliedly found that Burke's distress was proximately caused by defendant's wrongful acts, and it is immaterial whether defendant knew of Mrs. Burke's unstable mental condition. (*Cf. Sloane* v. *Southern Cal. Ry. Co.,* 111 Cal. 668, 683 [44 P. 320, 32 L.R.A. 193] ; *Guillory* v. *Godfrey,* 134 Cal.App.2d 628, 632 [286 P.2d 474] ; and *Rideau* v. *Los Angeles Transit Lines,* 124 Cal.App.2d 466, 471 [268 P.2d 772] ; which hold that a tortfeasor must take his victim as he finds him.)

■ With respect to the damages awarded to Acadia, defendant makes two claims of error. He first asserts that there is no evidence of damage suffered by the corporation, although there is evidence that Milner made various expenditures as a result of defendant's conduct. Since Acadia was the owner of the land and the water rights, and the Milners owned Acadia, an inference was permissible that Milner was acting for the corporation in making the payments. ■ Defendant next complains of an instruction that Acadia could recover the cost of drilling a new well on its land, arguing that such a recovery could be had, if at all, only on the theory that there had been an anticipatory breach by defendant and that this theory was inconsistent with the position taken by plaintiffs. The instruction, however, limited recovery to such expenditures as were made in an attempt to mitigate damages and were reasonably necessary under the circumstances. As so limited, the instruction was proper.

The judgment is affirmed.

Traynor, J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

Appellant's petition for a rehearing was denied July 20, 1960.