[Civ. No. 47686. Second Dist., Div. Four. Jan. 18, 1977.]

CIVIC WESTERN CORPORATION,
Plaintiff, Cross-defendant and Respondent, v.
ZILA INDUSTRIES, INC.,
Defendant, Cross-complainant and Appellant.

## COUNSEL

Barrett, Stearns, Collins, Gleason & Kinney and William N. Willens for Defendant, Cross-complainant and Appellant.

Gendel, Raskoff, Shapiro & Quittner and Richard S. Berger for Plaintiff, Cross-defendant and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—This appeal has been taken by defendant and cross-complainant Zila Industries, Inc. (hereinafter, Zila), from a summary judgment granted to plaintiff and cross-defendant Civic Western Corporation (hereinafter, Civic) on Zila's cross-complaint. We affirm in part, and reverse in part.

In order to more clearly understand the contentions of the parties, we deem it advisable to set forth both procedural and substantive details of this litigation.

Plaintiff Civic filed an action against defendant Zila on October 8, 1971; in its complaint, Civic alleged that, in 1969, Zila had executed two promissory notes in Civic's favor for $125,000 and $342,500 respectively. These notes were secured by Zila's business personal property, inventory and accounts receivable—evidenced by five security agreements executed' by Zila pursuant to the California Uniform Commercial Code. The complaint further alleged that Zila had defaulted on various of these obligations in August 1971, and that Civic had exercised its right to accelerate payment of the loans; Civic claimed that $232,597.40 was due.

Contained in the security agreements executed by Zila were provisions requiring Zila, in the event of default, to assemble and make available to Civic the collateral; the agreements further gave Civic the right to enter onto Zila's premises located at 835 Olive Street, Inglewood, to take possession of the collateral and to remain on the premises in order to sell the collateral to satisfy the debt. The collateral was alleged to include "furniture, furnishings, fixtures, machinery, equipment, inventory, accounts receivable, general intangibles and contract rights" of Zila. Civic alleged that it had demanded possession of the collateral in September 1971, but that Zila had refused to make it available.

Civic's first cause of action requested injunctive relief, alleging that it was necessary to prevent Zila from "using, encumbering, or disposing" of said collateral, and to compel Zila to give Civic immediate possession of the collateral in order to preclude irreparable injury to Civic. The second cause of action sought declaratory relief—a judicial determination that Civic was entitled to enter onto the premises of Zila to take possession of the collateral. The third cause of action sought the appointment of a receiver. The fourth, fifth and sixth causes of action of Civic's complaint were for money lent, for money had and received, on an account stated, and on the notes, all in the aggregate amount of $232,597.40, together with interest thereon. A temporary restraining order was issued October 13, 1971.

On October 28, 1971, the matter was set for hearing on Civic's request for a permanent injunction. The parties entered into a "Stipulation for Permanent Injunction." As a result, Zila agreed that it would be restrained "[f]rom preventing or in any manner interfering with the entrance of plaintiff" on the Inglewood premises of Zila for the purpose of taking possession of the collateral. Zila also agreed that it would be restrained from using said collateral either directly or indirectly. The parties also agreed that Civic could conduct a sale of the collateral from

the Inglewood premises, and could use "said premises rent free" for that purpose for a period not to exceed 60 days. It was also stipulated that the injunction was not to become operative if Zila paid to Civic all monies due to Civic, including accrued interest, costs and attorney's fees, on or before November 3, 1971, at 5 p.m. The "Judgment for Permanent Injunction" was filed and signed by the trial judge on October 29, 1971. It enjoined and restrained Zila "forever and permanently" from interference with Civic's right to entrance on Zila's premises for the purpose of taking possession of the collateral and from Zila's use of said collateral, effective November 3, 1971, at 5 p.m. Notice of entry of judgment was filed November 5, 1971.

On November 11, 1971, defendant Zila filed an answer to Civic's complaint, denying that Zila was in default; the answer alleged that Zila had agreed to the permanent injunction to prevent a receiver from being appointed while it was negotiating with another prospective lender; it charged that Civic had filed a false claim, and that the judgment entered following the stipulation was void, due to the alleged fraud and duress of Civic in obtaining Zila's consent to the stipulation.

Zila also filed a cross-complaint. In its first cause of action, it sought an accounting; it claimed that Civic had not accounted for the proceeds of accounts receivable which Zila had assigned to Civic during the course of their business relationship, and asserted that the assignment transactions were so involved and complicated as to require an accounting to determine the financial status of the parties with respect to each other; the total volume of these transactions was asserted to be in the area of $2 million.

The second cause of action was for trespass. Zila alleged that on November 4, 1971, agents of Civic had wrongfully taken possession of Zila's premises in Inglewood by ejecting Zila's employees from those premises and changing the locks on the doors.[1] As a result, Zila asserted that its president had been prevented from entering the premises to obtain Zila's books and records, materials needed by him to negotiate a new loan. Malice was claimed on the part of Civic, and exemplary damages were sought.

[1]Zila's attorney, Ruben, filed a cross-complaint of his own, alleging that he had sublet a rear office of the Inglewood premises for use as a law office, and that as a result of Civic's conduct, his use of this office was limited. Civic demurred to Ruben's cross-complaint, and the demurrer was sustained without leave to amend on January 11, 1972; this particular disposition does not concern us here, as the parties to this appeal are Civic and Zila.

A third cause of action in Zila's cross-complaint sought declaratory relief, and a fourth cause of action sought to have the injunctive judgment declared void. The cross-complaint was amended on December 1, 1971, by adding causes of action against Civic for forcible entry and forcible detainer. It was alleged in these causes of action that Civic (apparently while in possession of the premises conducting the collateral sale) had removed Zila's telephone system, had taken possession of Zila's incoming mail, and had retained possession of Zila's books and records, thus effectively putting Zila out of business. Civic demurred to this amended cross-complaint, a demurrer sustained with leave to amend on January 11, 1972.

The first amended cross-complaint filed thereafter contained five causes of action; it sought (1) an accounting; (2) damages for trespass; (3) damages for forcible entry; (4) an unlawful detainer judgment; and (5) declaratory relief determining that the stipulation for an injunction and the injunction judgment were void, as having been obtained through fraud, deceit and duress. Civic again demurred, at this time claiming that the trial court had no jurisdiction of the subject matter of the action, because the permanent injunction judgment was a final judgment from which no appeal had been taken. On June 2, 1972, the demurrer to the first amended cross-complaint was sustained without leave to amend as to the fourth cause of action for unlawful detainer only, but overruled as to the other four causes of action stated in the cross-complaint. The trial court rejected Civic's claim that it had no jurisdiction, stating that "(1) the Stipulated judgment was not a final judgment as to all issues (2) Proceedings to set aside a judgment may be made either in an independent action or in the same action."

Civic filed an answer to the cross-complaint on June 21, 1972, denying its allegations. Here the matter rested until October 7, 1974, when Civic sought summary judgment against Zila on the cross-complaint. Civic again made the "lack of jurisdiction" argument, and filed the declarations of its attorneys setting forth the procedural history of the litigation in support of its motion.

Zila filed a counterdeclaration of Attorney Ruben, advising the court that Civic had sold Zila's collateral on or about December 27, 1971, and had submitted a statement to Zila on January 27, 1972, stating that Civic had realized $240,000.79 from the sale. At this point, Zila claimed in the declaration opposing Civic's motion for summary judgment that Zila owed Civic $226,679.78, and that there was an excess collected by Civic

of $13,321.01. The declaration indicated that Civic had also collected accounts receivable in the sum of $3,331.38; that Civic was thus holding $16,652.39 in excess of any amount owed to Civic by Zila. Civic claimed, however, that it had expended $2,200.43 in attorney and collection costs in connection with the sale, and that the excess held by it was $14,451.96. This amount, according to Ruben's affidavit, was being retained by Civic to apply against additional attorney fees it might incur during the present litigation. An additional item to be considered, according to Ruben, was possession by Civic of $9,141.06 in uncollected accounts receivable.

In opposition to the summary judgment motion, Zila also filed the declaration of its president, Edwin W. Rose, who stated that there was a discrepency between the amount Civic had claimed was due on the chattel mortgage as of October 1971, and that claimed due as of January 27, 1972, in computing the proceeds of the collateral sale. Rose's affidavit also mentioned two other items, totalling over $8,000, which he claimed had not been properly credited to Zila. Rose stated that Civic had offered Zila an accounting by granting agents of Zila access to Civic's records, but that those records failed to show the respective amounts of respective accounts receivable assigned to Civic; that Civic's records did not evidence the respective amounts loaned or debited to Zila in said respective assigned accounts, nor did such records evidence the respective amounts credited to Zila for collections or payments received by Civic on these assigned accounts receivable.

Rose's declaration claimed that the records produced by Civic were insufficient to verify the numerous respective assignments of accounts and payments made thereon. Also filed in opposition to the summary judgment motion, was the declaration of Zila's accountant, Pesusich. He stated that an employee of Zila had personally delivered assigned accounts receivable to Civic but that on diverse occasions Civic failed to issue and deliver its check for said accounts receivable at the time it received the assignment, as specified in the security agreement of the parties concerning accounts receivable. According to Pesusich, the security agreement required the remission to Zila of 80 percent of the account value so assigned.

Civic's motion for summary judgment was denied initially on November 4, 1974, without a statement of reasons.

But on November 27, 1974, Civic filed a motion for reconsideration of its request for summary judgment, claiming that the trial court was not

fully informed as to the background of the action and had denied Civic's motion as being untimely, i.e., on the ground that it was being heard within 15 days of the trial date and had refused to hear argument on same. In its present motion for reconsideration, plaintiff and cross-defendant directed the trial court's attention to the stipulation of October 11, 1974, which expressly waived the necessity of timeliness for Civic's motion for summary judgment. The record before us does reflect that stipulation. Points and authorities were submitted by Civic to the effect that it was proper for a new trial judge to hear the reconsideration case, even though the previous motion had been denied.

The motion to reconsider was granted. Before the trial court on the reconsideration motion were all the previous affidavits referred to in this opinion, and some additional ones. Civic filed additional affidavits of Michael Dianich and John Turner, identified as officers of Aetna Business Credit, Inc. (formerly Civic), declaring that it had been the custom and business practice of Civic to send to Zila and all of Civic's customers continuous monthly statements, including the balance due at the beginning and ending of each month, reflecting any loan balance increase or decrease. It was also Civic's custom, according to Dianich, to make current reports to its customers on all collections received on accounts receivable. Dianich declared that he had met with Zila's president, Rose, on September 3, 1971, and had come to an agreement with him on the balance owed on all the loans. This agreement was assertedly set forth on a handwritten document filed with the affidavit, showing $219,165.03 owed by Zila, plus charges and fees, and showing the balance on accounts receivable to be $17,544.57, plus interest. The alleged agreement was not signed by anyone.

Dianich further declared that he had entered the Inglewood premises on November 4, 1971, without using force, and with the consent of Zila employees present on this occasion. Additionally, Dianich stated that he had met with Zila's president, Rose, and Attorney Ruben on October 18 and 21, 1974, and had "directed them" to documents on file with Civic which related to Civic's accounts with Zila, and that nothing had been withheld.

In support of Civic's motion for summary judgment, an affidavit by Attorney John Craig was filed, asserting that, on these particular October dates, Zila had been offered a full accounting. An affidavit by Attorney Frank Christl was also filed. This affidavit set forth his attempt to set up a meeting for further accounting, a meeting he stated was avoided by Rose and Ruben of Zila.

Civic filed an affidavit by Attorney Earl Glick stating that on October 26, 1971, Edwin W. Rose, Zila's president, had admitted to him that Zila was in default. Civic also submitted the deposition of Rose taken May 14, 1973, in which Rose stated that he had told Attorney Glick on October 13, 1971, that Zila was prepared to pay Civic the total due, described by him as $219,000 some odd dollars. Rose had computed this amount, through Civic's own computer readouts, the documents received from Civic on the equipment payments, the handwritten demand of Mike Dianich. Rose further stated in his deposition that he had gone over the figures with Dianich but that they had not totally resolved the matter.

Civic also submitted another deposition of Rose taken on April 12, 1973, wherein Rose admitted receiving from Civic a computer readout on accounts receivable every five or six weeks during the business relationship of Civic and Zila. Civic also filed an affidavit of Alan Wagner, now the assistant controller of Aetna, stating that monthly statements were sent to Zila by Civic on accounts receivable and on its chattel mortgage. Finally, Civic filed the affidavit of Attorney Christl, stating that the expenses to Civic of litigating this matter had now passed the $33,000 mark, and that, therefore, nothing was presently owed by Civic to Zila.

Zila, in opposing the renewed motion for summary judgment, filed affidavits by Rose, Pesusich and Warnock. Rose specified items over which there remained a dispute; Pesusich reiterated that Zila had not received complete accounting information from Civic; Warnock stated that she had, on November 4, 1971, as a Zila employee, given Dianich the keys to Zila's premises, because of her fear of forcible ejection.

On December 11, 1974, the trial judge granted summary judgment to Civic, and vacated the trial date of January 16, 1975. This appeal followed.

We refer briefly to the rules applicable to an appellate review of a summary judgment granted by the trial court. These rules are well settled. ▇▇ We weigh the conduct of the trial court by this standard: " 'The matter to be determined by the trial court in considering [the summary judgment motion] is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. . . . The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence

requiring the weighing procedures of a trial.' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953].) ■ "[T]he affidavits of the moving party are to be strictly construed and those of the opponent liberally construed." (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310].) ■ The affidavits of the moving party are not only subject to strict construction, but must stand alone, without reference to the counteraffidavits. (*Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117 [109 Cal.Rptr. 724].) In the recent case of *Buehler* v. *Oregon-Washington Plywood Corp.* (1976) 17 Cal.3d 520, 526 [131 Cal.Rptr. 394, 551 P.2d 1226], we were reminded that "[s]ummary judgment may only be granted if no material fact issue remains in the case. ■ Where affidavits have been submitted by the opposing parties, any doubts as to whether summary judgment is proper should be resolved against the moving party. [Citation.]"

. With this standard in mind, we approach the matter at bench, a lingering dispute between a commercial debtor and its factor. The first, and perhaps foremost, basis upon which summary judgment was granted to Civic was the view of the trial court that the judgment that granted a permanent injunction to Civic, based upon a stipulation of the parties, was a final judgment terminating the dispute of the parties, thereby ending the jurisdiction of the trial court before Zila filed its answer and cross-complaint. The opposing parties to this appeal argue their positions premised upon various definitions of "judgment" and "final judgment." Without an extended discussion of semantics, we observe that these terms are meaningless unless qualified by context, i.e., a judgment may be final, but modifiable at the trial level, or final for the purpose of appeal. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, § 2, pp. 3182-3183.)

Section 577 of the Code of Civil Procedure provides that "[a] judgment is the final determination of the rights of the parties in an action or proceeding." We are not concerned here with the "one-judgment" rule, as the parties suggest, but simply with the issue. of what constitutes finality. The decisional law has interpreted finality as that situation where the judgment leaves no issue for future consideration (*People* v. *Wright* (1975) 47 Cal.App.3d 490, 492-493 [120 Cal.Rptr. 899]), or where it is "finally dispositive" of the case (*Lincoln Nat. Life Ins. Co.* v. *Mitchell* (1974) 41 Cal.App.3d 16, 19 [115 Cal.Rptr. 723]). Of crucial importance in determining finality is the point at which the determination is made. ■ We have concluded that the finality of a judgment

can only be weighed in terms of the situation as it existed *at the time the judgment is entered,* rather than basing the determination on the occurrence of events after judgment which establish, by hindsight, that the judgment obtained did in fact give to the prevailing party all the relief it found necessary.

In the instant case, Civic sought, by its various causes of action in its complaint, to recover a total sum of money it claimed was due from Zila. One means for recovery, but only one, was the pursuit of the collateral, which was facilitated by the granting of the permanent injunction. There remained, however, after the permanent injunctive judgment was entered, other causes of action in the complaint directed toward other avenues of recovery. There is no doubt that, at *the time of entry* of the injunctive judgment, these other causes of action, particularly those for money, remained viable. One need only assume that, had Civic sold the collateral in December 1971, without realizing the amount necessary to satisfy Civic's claim of the amount of Zila's debt, "hindsight" would have operated differently. We have no doubt that Civic would have returned to the courtroom, ready to proceed on the other causes of action in an effort to secure complete satisfaction. The security agreements specifically provided that after a sale of collateral, "[a]ny balance shall be applied upon the Obligations of Debtor to Secured Party and in the event of any deficiency, Debtor shall remain liable to Secured Party."

Civic now contends, however, that, by the entry of the permanent injunction, it was intended that this remedy be exclusive, i.e., that it constituted a judicial determination that Civic was giving up its principal objective of recovering the total sum it claimed to be due from Zila, gambling upon the amount the sale of collateral would produce. We do not accept this argument; it is not at all reasonable. Neither the stipulation nor the judgment contained any language suggesting that Civic obtained the injunction in lieu of other relief also sought by its complaint. We regard the entry of the injunctive judgment as tantamount to the entry of a partial summary judgment, dispositive only of a portion of the lawsuit, as the situation existed at that time. Zila, therefore, had the right to file both its answer to Civic's complaint and its cross-complaint. The trial court had the requisite jurisdiction to consider the issues raised by these pleadings. Thus, the summary judgment with which we are concerned here cannot be upheld on grounds that the trial court lacked jurisdiction other than to grant Civic's motion for summary judgment.

We now turn to a consideration of the affidavits filed in the trial court which bear upon the causes of action stated in the cross-complaint. The first cause of action seeks an accounting from Civic, primarily on the ground that the transactions between the parties were sufficiently complex to require it. ■ An accounting cause of action is equitable in nature, and may be sought "where . . . the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable." (3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 674, pp. 2300-2301.)

"A suit for an accounting will not lie where it appears from the complaint that none is necessary or that there is an adequate remedy at law. [Citations.] An accounting will not be accorded with respect to a sum that a plaintiff seeks to recover and alleges in his complaint to be a sum certain." (*St. James Church* v. *Superior Court* (1955) 135 Cal.App.2d 352, 359 [287 P.2d 387].)

Civic sought to establish by its affidavits that no accounting was necessary because one had already been given, and that Zila could calculate from the information it had received the sum, if any, due it from Civic after the sale of the collateral. The affidavits of Civic's officers declared that their customary business practice was to impart continuous financial information to its customers. ■ But such a business practice does not, in and of itself, establish that such a practice amounted to a valid and unimpeachable accounting. Civic certainly relied upon the specific figures set forth in its statement to Zila in January 1972, as an accurate account of the parties' financial status vis-a-vis each other, as of that time. The Christl affidavit asserted, however, without specifics, that the excess amount realized from the sale of the collateral—owed by Civic to Zila—had now been expended in attorney fees incurred by Civic with respect to the action before us.

The affidavits of Zila's officers asserted that, despite the information they had received, it was impossible to calculate a sum certain which constituted a final determination of accounts. Zila relied heavily on the accounts receivable situation. The security agreement as to these accounts contemplated that there would be occasions (due to lack of collection and other charges) when the presentation to Civic by the customer (Zila) of invoices or other income-producing documents, would not result in immediate payment of 80 percent of face value to Zila. Therefore, the assertion by accountant Pesusich, that payment was not always immediately forthcoming from the factor (Civic) to the customer (Zila) in particular transactions has no relevance to the issue of whether

Civic made an appropriate accounting to Zila. The record further establishes that Zila did receive computer readouts as to accounts receivable, but does not tell us whether these computerized statements were sufficiently detailed to allow Zila to trace particular accounts, thereby enabling Zila to confirm whether total balances were correct.

■ The proponent of summary judgment is required to negate *all* possible merit inherent in the cause of action it seeks to terminate. (*Residents of Beverly Glen, Inc., supra,* 34 Cal.App.3d 117, at pp. 127-128.) In view of the voluminous transactions between the parties, the discrepancies in the total amount claimed due by Civic at various times during this litigation, and the additional problem raised by Civic's continued retention of the balance remaining after the sale of the collateral assets, we conclude that triable issues of fact with respect to the present financial relationship of the parties exist, and can only be finally set to rest by trial of the accounting cause of action.

Also, included among the accounting issues subject to determination on remand is that relating to attorney fees, within the context of the security agreements executed by the parties and the prevailing law.

The pertinent provisions of the security agreements allow the secured creditor the right to retain any balance remaining after sale of the collateral which is necessary for "all costs and charges, including attorneys' fees for advice, counsel or other legal services or for pursuing, reclaiming, seeking to reclaim, taking, keeping, removing, storing and advertising such collateral for sale and any and all other charges and expenses in connection therewith and any prior liens thereon."

The agreements further provide: "In the event, by reason of any suit or proceeding of any kind, nature or description against Debtor, making it advisable for Secured Party to seek counsel for the protection and preservation of its security interest, such expenses and counsel fees shall be allowed to Secured Party and the same shall be made a further charge and lien upon the Collateral."

The accounts receivable security agreement provides for reimbursement by the debtor to the creditor for attorney fees and related expenses incurred in obtaining the collateral, "*or* in the defense of any action or proceeding instituted or maintained vs. Company growing out of or connected with the subject matter of this agreement and/or the receivables pledged hereunder." (Italics added.)

These provisions relating to attorney's fees must be viewed in light of Civil Code section 1717, which states: "In any action on a contract, where such contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of such contract, shall be awarded to one of the parties, the prevailing party, *whether he is the party specified in the contract or not,* shall be entitled to reasonable attorney's fees in addition to costs and necessary disbursements." (Italics added.)

■   The record establishes that, as of January 1972, Civic was *claiming some $2,200 in expenses, including legal fees,* incurred with respect to the collateral, and was holding at least $14,000 to be applied to future obligations. The only reference to such future obligations was furnished by the Christl affidavit, which stated that any balance that had been due Zila by Civic had been extinguished by legal fees presently owed by Civic in connection with the present action.

This is insufficient to determine the appropriate disposition of the balance retained by Civic, assuming for the purpose of discussion only, that that balance has been correctly stated. It is elementary that attorney fees must be reasonable, and that the party claiming them must establish (1) not only entitlement to such fees but (2) the reasonableness of the fees claimed. Neither of these elements has been established in this record, making it impossible to tell with any degree of certainty what is the amount owed, to whom, and by whom. The summary judgment granted to Civic in the case at bench dispensed with the quest for answers to these details. The summary judgment must be reversed as to the cross-complainant's first cause of action. Whatever the outcome at the trial, the judgment finally rendered should reflect a determination of *all* issues remaining in dispute between the parties.

In the second and third causes of action of the cross-complaint, cross-complainant Zila sought damages, including punitive damages, for the alleged trespass and forcible entry by Civic onto Zila's premises. Civic's response to these allegations has been denials and reliance on the proposition that the advance consent given by Zila to Civic, pursuant to the security agreements, for Civic to enter Zila's premises, and to sell the collateral operated as a bar to any cause of action by Zila complaining of invasion of Zila's property rights.

■   The essence of the cause of action for trespass is an "unauthorized entry" onto the land of another. Such invasions are characterized as intentional torts, regardless of the actor's motivation. Where there is a

consensual entry, there is no tort, because lack of consent is an element of the wrong. "A peaceable entry on land by consent is not actionable." (4 Witkin, Summary of Cal. Law (8th ed. 1974) § 351, p. 2612.) ■ An entry to repossess personal property, as provided in the contract for the sale of that property, is such a consensual entry, and is not a trespass. (*Williams* v. *General Elec. Credit Corp.* (1958) 159 Cal.App.2d 527, 532 [323 P.2d 1046].) Civic relies upon *Williams*, and also upon the Restatement Second of Torts, section 183, in this regard.

What cross-complainant Zila has alleged, however, is that Civic *exceeded* the consent admittedly conferred by the security agreements, the stipulation, and the judgment, when Civic entered Zila's premises and ejected Zila's employees and changed the locks on the doors. ■ It seems clear, however, that a trespass may occur if the party, entering pursuant to a limited consent, i.e., limited as to purpose or place, proceeds to exceed those limits by divergent conduct on the land of another. "A conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with." (Rest.2d Torts, § 168.)

Section 183 of the Restatement notes that the privilege conferred must be exercised at a "reasonable time and in a reasonable manner."

Nothing in the security agreements, or in the stipulation, or in the judgment, provided for the entry of Civic onto Zila's premises for any purpose other than that of securing the collateral and selling it. Nothing extended Civic's entry privilege to one of exclusive possession of Zila's premises in the sense that Zila's employees and officers were prohibited from remaining there. Whether Civic can successfully persuade the trier of fact that these steps were necessary to secure the collateral remains for determination at the trial.

A forcible entry may be committed by one "[w]ho, after entering peaceably upon real property, turns out by force, threats, or menacing conduct, the party in possession." (Code Civ. Proc., § 1159.) Civic relies upon the discussion of the primary purpose of the forcible entry and detainer statutes set forth in *Daluiso* v. *Boone* (1969) 71 Cal.2d 484, 498 [78 Cal.Rptr. 707, 455 P.2d 811] as a holding that these statutory causes of action are for the *exclusive* purpose of restoring real property to a rightful owner. *Daluiso,* however, held that certain invasions of peaceable possession were the bases for tort liability existing independent of statutory law. Restitution of possession is not the only remedy available,

for forcible entry. Code of Civil Procedure section 1174, subdivision (b), provides for an award of damages, including treble damages, for forcible entry.

In the affidavits, Dianich asserted that he entered the premises without force, and was given the keys on request; Warnock, Zila's employee, declared that Dianich's mien was threatening, and that she gave him the keys because of her fear of forcible ejectment. Regardless of the actual circumstances of this event, no one denies that Zila's officers and employees were prevented from remaining on Zila's premises, and that the officers were prevented from access to their personal records. This precludes the granting of a summary judgment on these causes of action. The *Williams* holding is distinguishable on the facts; it did not involve any attempt on the part of the repossessor to exclude the plaintiff from her premises.

Civic also has argued here that, since the description of collateral in the security agreements included Zila's "contract rights," it of necessity included Zila's leasehold rights in the premises where the entry was made, an interpretation unlikely to prove sound. It may, however, be the subject of extrinsic proof when this matter is returned for trial, in which case the interpretation may be based in part on factual grounds.

Some discussion of the existence of damages as the result of the allegedly intentional tort of trespass is required. This tort has always given rise to nominal damages even where there was no proof of actual damage. ▉▉ Whether Zila would be entitled to more than nominal damages, should trespass be established, is for the trier of fact. We are not unmindful that Zila was, as the result of the permanent injunction, no longer able to conduct its ordinary business, due to the loss of its business personal property, so that it is apparent that future profits lost would not be in issue. (Johns, Cal. Damages (1969) Property Damage, § 31, pp. 338-339.) It appears also that the reasonable value of the use of the property (*Story* v. *Gateway Chevrolet Co.* (1965) 237 Cal.App.2d 705 [47 Cal.Rptr. 267]), in this case, the business premises, would be minimal, where the use could only be termed nonexclusive and nonincome producing.

While there are two decisions holding that a plaintiff in peaceable possession of real property may recover in tort for physical damage to his person or goods, including emotional distress damage (e.g., *Acadia, California, Ltd.* v. *Herbert* (1960) 54 Cal.2d 328 [5 Cal.Rptr. 686, 353 P.2d

294] and *Daluiso, supra*), we know of no authority suggesting that a corporate entity may recover for the emotional distress of its officers.

However, as nominal or minimal as actual damage may be in the instant case, if Civic's conduct was such that the trier of fact determines that a *punitive* damages award is in order, it matters not whether actual damages were minimal in nature. (Civ. Code, § 3294; *James v. Public Finance Corp.* (1975) 47 Cal.App.3d 995 [121 Cal.Rptr. 670]; *Aweeka v. Bonds* (1971) 20 Cal.App.3d 278, 281 [97 Cal.Rptr. 650].)

■ As indicated previously, the fourth cause of action, alleging unlawful detainer, was met by a demurrer in the trial court, which was sustained without leave to amend. On this appeal, defendant and cross-complainant Zila contends that this disposition of the fourth cause of action was in error. We disagree. Unlawful detainer, taken alone, is a statutory cause of action which was created to provide a summary means for *retaking possession* of property by the rightful owner thereof. (Code Civ. Proc., § 1161; *Union Oil Co. v. Chandler* (1970) 4 Cal.App.3d 716 [84 Cal.Rptr. 756].) The record before us establishes that, at the time the demurrer was before the trial court, cross-defendant Civic had left the premises involved in the dispute, and hence no possessory action could be maintained. The demurrer, therefore, was properly sustained without leave to amend.

In its final cause of action, cross-complainant Zila requested declaratory relief, i.e., a determination that the injunction judgment be set aside on the ground that the stipulation for such judgment was occasioned by Civic's "fraud and duress."

■ A judgment, whether obtained by litigation or by consent, may be attacked where extrinsic fraud was employed to secure it. Extrinsic fraud is present where a party to a lawsuit has been denied a fair adversary hearing on the merits of the case through no fault of his own. (*Kulchar v. Kulchar* (1969) 1 Cal.3d 467, 471-472 [82 Cal.Rptr. 489, 462 P.2d 17, 39 A.L.R.3d 1368].) Undoubtedly, duress under particular circumstances could also form the basis for successful attack, although the duress experienced by a debtor who has fallen behind in repayment to a creditor and who faces the loss of a business as the result, is not in and of itself actionable.

Civic filed the affidavit of Attorney Glick, specifically denying that any fraudulent misrepresentations or actionable compulsion had been prac-

ticed in negotiating the stipulation for the permanent injunction. Zila was markedly silent in its affidavits concerning its original claim, made in its answer, that Civic had commenced legal proceedings against it on the basis of a false claim. Neither the answer nor the cross-complaint stated facts sufficient to support a claim of extrinsic fraud.

The whole tenor of the affidavits, and admissions (contained in deposition testimony) and, in fact, the entire procedural course of this litigation supports the conclusion that Zila was in default, in some amount, at the time Civic filed its complaint (although, as we have discussed, there remains unresolved the actual amount due Civic at that point). The summary judgment was therefore properly granted as to the fifth cause of action of the cross-complaint.

The judgment appealed from is reversed as to the first three causes of action stated in the cross-complaint; the judgment is affirmed as to the fifth cause of action stated in the cross-complaint.

Appellant is to recover its costs on appeal.

Files, P. J., and Kingsley, J., concurred.