In re RAINBOW MUSIC, INC., dba Rainbow Records, a California corporation, Debtor.

Richard J. SPEAR, Plaintiff,

v.

CEMA DISTRIBUTION, Defendant.

Bankruptcy No. 92–42672 TS.
Adv. No. 92–4507 AT.

United States Bankruptcy Court,
N.D. California.

May 11, 1993.

Dennis Davis, San Francisco, CA, for plaintiff, debtor.

David Kronemyer, Woodland Hills, CA, for defendant.

## MEMORANDUM OF DECISION

LESLIE TCHAIKOVSKY, Bankruptcy Judge.

Plaintiff Richard J. Spear (the "Trustee"), the Chapter 7 trustee of Rainbow Music, Inc. ("Rainbow" or "Debtor"), seeks to avoid a transfer made by check in the amount of $8,242 to Cema Distribution ("CEMA" or "Defendant") as an unauthorized post-petition transfer pursuant to 11 U.S.C. § 549(a) and to recover the amount of the unauthorized transfer from CEMA. For the reasons stated below, the Court finds in favor of Plaintiff.

### SUMMARY OF FACTS

Prior to experiencing financial difficulties in late 1990, Rainbow operated over thirty retail record outlets. By April of 1992, all but three of Rainbow's stores had been closed. On April 9, 1992, Rainbow entered into a written agreement to sell the three remaining stores to MTS, Inc. ("MTS"), doing business as Tower Records.

The sale was structured by dividing the assets of Rainbow into four separate categories, each of which was assigned a value or sales price. These categories were grouped into inventory items (the "Inventory") and non-inventory items (the "FF & E"). The inventory items were composed of records, tapes, compact discs and other related products. The non-inventory items included furniture, fixtures and equipment, and leaseholds and improvements.

The agreed upon value of the Inventory was $331,884. After determining the aggregate value of the Inventory, the parties allocated a specific dollar amount to each of Rainbow's inventory suppliers, who held security interests in the Inventory. A $10,000 allocation was made to CEMA.

The agreed upon value of the FF & E was $125,000. Again, as with the Inventory, the total value of the FF & E was broken down, and a specific amount allocated to each supplier. Unlike the Inventory, however, these suppliers did not hold any security interest in the FF & E. The allocation to CEMA on behalf of FF & E was $8,242.

Under the terms of the sale, MTS was to pay each supplier directly, as creditors of Rainbow, its allocated portion of the purchase price attributable to the Inventory and the FF & E. In accordance with the sale agreement, MTS sent CEMA a check for $10,000 in March of 1992 (the "First Check"). It is undisputed that the First Check was in payment of CEMA's allocated portion of the purchase price attributable to the Inventory. Accompanying the First Check was a letter stating that tender of the check was subject to CEMA releasing its security interest in the Inventory. CEMA deposited the check in its account shortly after receiving it.

Shortly thereafter, on April 9, 1992, MTS sent CEMA a second check (the "Second Check"), this time in the amount of $8,242. It is undisputed that the Second Check was in payment of CEMA's allocated portion of the purchase price attributable to the FF & E. Accompanying the Second Check was another letter stating that tender of the check was subject to CEMA releasing its security interest in Rainbow's inventory. In addition, the letter requested that an enclosed UCC–2 release form be signed and returned. CEMA signed and returned the release form and deposited the Second Check. An involuntary petition was filed against the Debtor on April 13, 1992. The Second Check was honored by the drawee bank on April 27, 1992.

### DISCUSSION

The Trustee seeks to avoid the transfer made in connection with the Second Check and to recover the amount of the avoided transfer from CEMA pursuant to 11 U.S.C.

§ 549(a) and § 550(a)(1). Section 549(a) provides as follows:

> (a) Except as provided in subsections (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—
>
> > (1) made after the commencement of the case; and
> >
> > (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
> >
> > > (B) that is not authorized by this title or by the court.

Section 550(a)(1) permits a trustee to recover the amount of the avoided transfer from the immediate transferee. Whether the Trustee should prevail in this action turns on two significant issues: (1) whether the transfer in question occurred after the commencement of this case; and (2) whether CEMA is entitled to a defense under 11 U.S.C. § 549(b). Each of these issues is discussed below.

## A. DID THE TRANSFER OCCUR POST-PETITION?

■ As noted above, the Second Check was delivered to CEMA on April 9, 1992 and honored by the bank on April 27, 1992. The bankruptcy case commenced when the involuntary petition was filed, on April 13, 1992. Thus, whether the transfer represented by the Second Check occurred prior to or after the commencement of the case depends on when a transfer by check occurs in the context of 11 U.S.C. § 549—on the date of delivery or on the date the check is honored.

But for the decision of the United States Supreme Court in *Barnhill v. Johnson*, — U.S. —, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), the date of the transfer would be clear. In the Ninth Circuit, until recently, the law was that a transfer by check occurs on the delivery date for avoidance actions brought under either 11 U.S.C. § 547 or § 549. *In re Trois Etoiles, Inc.*, 78 B.R. 237 (9th Cir. BAP 1987) (Section 549 transfers) and *In re Kenitra, Inc.*, 797 F.2d 790 (9th Cir.1986) (Section 547 transfers).

In *Barnhill*, the Supreme Court held that, for Section 547 purposes, a transfer by check occurs on the date the check is honored, thus overruling *Kenitra*. Neither the 9th Circuit nor the Bankruptcy Appellate Panel have ruled on this issue in the context of an action under Section 549 since the *Barnhill* decision. This Court concludes that, given the rule established for preferential transfers in *Barnhill*, the date of honor rule must also be used in the Section 549 context. There are two principal reasons for the Court's conclusion.

■ First, the *Barnhill* decision was founded upon the treatment of check transfers under the Uniform Commercial Code. *Barnhill*, — U.S. at — - —, 112 S.Ct. at 1389–1390. Under the Uniform Commercial Code, the recipient of a check has no cause of action against the drawee bank for refusal to the honor the check. (citing U.C.C. § 3–409, adopted in California as Cal.Comm.Code § 3409). "The recipient of a dishonored check, received in payment on an underlying obligation, may maintain an action either on the check or on the obligation." *Id.* (citing U.C.C. § 3–802, adopted in California as Cal.Comm.Code § 3802).

Thus, the check recipient has no right to the funds held by the bank in the drawer's account. Should the drawer stop payment on the check, close the account, or should other checks be presented first exhausting available funds in the account, the check would likely be dishonored. As such, there is no unconditional transfer of the debtor's interest in property until the bank honors the check. Precisely the same rationale applies with respect to checks delivered before the commencement of a bankruptcy case which are honored after its commencement (or for that matter which are both delivered and honored after its commencement).

■ Second, to hold otherwise would create an anomaly. If the date of honor rule applied to preferences and the date of delivery rule applied to post-petition transfers, a safe harbor would be created for certain transfers by check. A check, like the Second Check, which was delivered before the commencement of the bankruptcy case and honored after its commencement,

would be recoverable neither as a preference nor as a post-petition transfer. There is no suggestion in the language of the Bankruptcy Code or its legislative history that such a safe harbor was intended. This Court can envision no policy reason for making such transfers immune from recovery. To the contrary, if such inconsistent rules were adopted, as the Trustee argues, debtors could plan such transfers to prefer creditors without fear of voidability. This result must be avoided.

## B. DID CEMA GIVE VALUE FOR THE SECOND CHECK?

Clearly, the transfer represented by the Second Check was neither authorized by the bankruptcy court nor by the Bankruptcy Code.[1] Thus, the transfer is avoidable under 11 U.S.C. § 549(a). The only remaining issue is whether CEMA is entitled to a defense barring avoidance of the transfer under 11 U.S.C. § 549(b).

■ Section 549(b) provides as follows: In an involuntary case, a transfer made after the commencement of the case but before the order for relief to the extent any value, including services, but not including satisfaction or securing of a debt that arose before commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has.

Read literally, this provision is incomprehensible. Language appears to have been inadvertently omitted. This Court will assume that the following phrase should be inserted at the beginning of the provision: "The trustee may not avoid under subsection (a) of this section ...". This language parallels the text of subsection (c), a defense provided to good faith purchasers of real property. Thus, the trustee may not avoid transfers made during the involuntary gap period to the extent any post-petition value is given in exchange for the transfer.

CEMA contends that it is entitled to a defense under 11 U.S.C. § 549(b) in that it gave value in return for the Second Check by releasing its security interest in the Inventory. There are two problems with this contention. First, CEMA had no security interest to release by the time the UCC–2 release form was signed and returned. Second, no evidence was presented that the release form was returned after the commencement of the bankruptcy case.

■ As noted in the summary of facts, the letter accompanying the First Check stated that the check was tendered upon the condition that CEMA release its security interest in the Inventory. Fully aware of this condition, CEMA accepted and negotiated the First Check. It is well established in California that cashing a check delivered with a statement of conditions for its acceptance, either written on the check itself or in an accompanying statement, operates as an acceptance of the stated conditions. *Acadia v. Herbert*, 54 Cal.2d 328, 5 Cal.Rptr. 686, 353 P.2d 294 (1960); *Potter v. Pacific Coast Lumber Co.*, 37 Cal.2d 592, 234 P.2d 16 (1951). Here, CEMA's cashing of the First Check was an implied acceptance of the condition regarding release of its security interest in the Inventory.

■ Section 9405 of the California Commercial Code provides that a secured party may release a security interest by filing a written release with the Secretary of State. However, the Commercial Code does not provide that filing a written release is the only manner in which a security interest may be released. The courts in other states have held that Section 9405 is permissive rather than mandatory. *In re Belize Airways Ltd.*, 7 B.R. 604 (Bankr. S.D.Fla.1980) (oral release of security interest effective); *In re Bar C Cross Farms & Ranches*, 48 B.R. 976 (Bankr.D.Colo.1985) (filing of statement of release not mandatory); *Intermountain Brick Co. v. Valley Bank*, 746 P.2d 427 (Wyom.S.Ct.1987) (no duty to file a release); *Butler v. Roberts*,

---

**1.** The transfer may have been authorized by 11 U.S.C. § 303(f), which permits an involuntary debtor to dispose of property in the gap period.

However, such authorization is specifically delineated as not being a defense to 11 U.S.C. § 549 pursuant to subsection 549(a)(2)(A).

437 N.W.2d 839 (N.Dak.S.Ct.1989) (failure to file release did not prevent release of security interest). Although the Court has been unable to locate any California authority on point, it presumes that California would reach the same conclusion as the other courts that have considered the question.

Assuming CEMA cashed the First Check before it signed and returned the release form with respect to the Second Check, signing and returning the release form gave the Debtor no value. CEMA had already effectively released its security interest prior to signing and returning the form. Thus, CEMA would not be entitled to a defense to the avoidance action under 11 U.S.C. § 549(b).

 No evidence was presented on when the First Check was cashed. It is possible that it was cashed after the release form was signed and returned. If so, the execution and return of the release form would have provided value to the Debtor. However, the failure to present evidence on this issue is fatal to CEMA's claim of the defense since CEMA has the burden of proof on this issue. Moreover, CEMA also failed to present evidence as to when the release form was signed and returned. Section 549(b) requires that the value be given after the commencement of the bankruptcy case. The release form may well have been signed and returned before the commencement of the bankruptcy case. Again, since this question is part of CEMA's defense, the failure to offer evidence on this issue is fatal to CEMA's position.

## CONCLUSION

In sum, the transfer represented by the Second Check may be avoided under 11 U.S.C. § 549 and the amount of the transfer recovered from CEMA pursuant to 11 U.S.C. § 550(a)(1). The transfer occurred when the check was honored by the drawee bank. This occurred after the commencement of the bankruptcy case. The transfer was neither authorized by the bankruptcy court nor by the Bankruptcy Code.

CEMA failed to establish a defense to avoidance under 11 U.S.C. § 549(b). CEMA failed to establish that it gave value to the Debtor after the commencement of the case in return for the transfer. It appears that, when CEMA signed and returned the release form in return for the Second Check, it may already have effectively released its security interest in the Inventory by negotiating the First Check. While the timing of these events was not precisely established—so that conceivably the First Check might have been negotiated after the release form was signed and returned—CEMA had the burden of proving this sequence of events in order to establish its defense. Moreover, CEMA failed to establish the second element of its defense—that the release form was signed and returned after the commencement of the bankruptcy case.

The Court directs counsel for the Trustee to submit a proposed form of judgment in accordance with this decision.