67 F.3d 310
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
The WILLIAM H. MORRIS CO., Plaintiff-counter-defendant-appellant,
v.
GROUP W. INC.; Jerry Wilson,
Defendants-counter-claimants-appellees.
The WILLIAM H. MORRIS CO., Plaintiff-counter-defendant-cross-appellee,
v.
GROUP W. INC.; Jerry Wilson,
Defendants-counter-claimants-cross-appellants.
 Nos. 94-55365, 94-55453.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 7, 1995.
Decided Sept. 27, 1995.
 
 Before: BROWNING, NORRIS, and REINHARDT, Circuit Judges.
 
 
 1
 MEMORANDUM*,**
 
 I. Amount of Damage
 
 2
 Group W failed to meet its burden of providing a "reasonable basis" for the computation of the amount of damage resulting solely from the October 23 letter because the damage estimates were premised both on the October 23 letter and Omicron conspiring to drive Group W's distributor, Shannon Supply, out of business, an allegation rejected by the district court.[1] See Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir.1993).
 
 
 3
 Vinso offered two exhibits depicting the results of his lost profits analysis for Food Plus. Exhibit F estimates lost profits starting in April 1992, the date of Shannon Supply's dissolution. This exhibit "was generated to aid in the determining of losses due to the dissolution of Shannon Supply."
 
 
 4
 Exhibit E estimates lost profits after Omicron sent the October 1991 letter, which might suggest the exhibit displays the estimated damages resulting from the letter. However, the estimated losses in Exhibit E starting from April 1992, when Shannon Supply dissolved, are exactly the same as those found in Exhibit F. This identical overlap indicates that Exhibit E depicts the estimated total damage from both the letter and the alleged conspiracy to dissolve Shannon Supply. This interpretation is buttressed by the fact that the estimated lost profits set forth in Exhibit E increase sharply (five- to six-fold) after April 1992. The obvious reason for this increase is that the exhibit takes into account damages due to the dissolution of Shannon Supply, and Group W offers no alternative explanation.
 
 
 5
 Thus, neither Exhibit E nor Exhibit F reflects the estimated lost profits due solely to the October letter. Hoffman's testimony did not offer an independent theory of damages but focused instead only on errors in Vinso's computational methodology. Accordingly, if on remand the district court determines that Omicron is liable under the Lanham Act, see supra note **, the court must also determine the amount of damage due solely to Omicron's letter.
 
 II. Discovery Sanction
 
 6
 We reject Omicron's argument that the district court abused its discretion because it did not evaluate the degree of prejudice caused by the discovery violation. See In re Rubin, 769 F.2d 611, 617 (9th Cir.1985). The district court clearly did consider the element of prejudice--it began the hearing on the motion by asking counsel to identify what prejudice, if any, Group W suffered. Furthermore, Omicron's failure to turn over the drafts of the letter prior to the discovery cutoff date was prejudicial because Group W could not ask Morris about the drafts during his deposition.
 
 
 7
 The excluded evidence was not crucial to Omicron's case. At most, the drafts would have corroborated the testimony of two witnesses that Morris did not know of Group W's plans to develop a rival product when he drafted the letter. The key finding of the district court, however, was that Morris knew of Group W's plans four days before sending the letter and therefore should have anticipated recipients would view it as referring to Food Plus. The drafts would not have undercut this finding.
 
 
 8
 Given the relative lack of importance of the documents and the fact that Omicron was at fault for not having produced them earlier, we do not have "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Wyle v. R.J. Reynolds Indus., 709 F.2d 585, 589 (9th Cir.1983) (quoting Anderson v. Air West, Inc., 542 F.2d 522, 524 (9th Cir.1976) (internal quotation omitted)).
 
 III. Breach of Contract Claim
 
 9
 The district court did not err by granting summary judgment for Omicron on its breach of contract claim.
 
 
 10
 Group W voluntarily accepted shipments and paid the invoices, including the advertising charges, for over two months. Under California law, such "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the acts are known, or ought to be known, to the person accepting." Calif. Civil Code Sec. 1589. Although Group W subsequently stopped paying the advertising component of the invoices, it did not contend the charges were not due. Rather, when Omicron demanded payment of past due advertising charges, Group W promised to pay them and in fact did so in part.
 
 
 11
 Moreover, even while not paying for the advertising, Group W continued to accept shipment of the product and indicated no desire to terminate the relationship, even though the advertising invoices made clear that the product was being shipped to Group W on condition that it pay for advertising. "Where something to which the offeree is not unconditionally entitled is tendered to him upon stated conditions and he exercises dominion over it, he is bound by the conditions even though he informs the offeror that he rejects them." Acadia, California, Ltd. v. Montague Herbert, 54 Cal.2d 328, 336 (1960).
 
 
 12
 Group W's claim that it received no benefit from the advertising is without merit. "The Supreme Court assumes as a matter of law that advertising increases consumption of the product or service being advertised." Cal-Almond, Inc. v. U.S. Dep't of Agriculture, 14 F.3d 429, 439 (9th Cir.1993). Because Group W made a profit on each bottle sold, the increase in consumption conferred a benefit on Group W. Group W might have been able to spend the $4.50 per bottle on advertising more efficiently than Omicron did, but that fact bears only on the degree of benefit Group W received.
 
 
 13
 Each party to bear its own costs.
 
 
 14
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 **
 Omicron's appeal of the district court's finding of liability under the Lanham Act is addressed in a separate published opinion
 
 
 [1]
 Group W also points to other testimony on the record that the letter severely damaged Group W and devastated its marketing efforts. However, this testimony goes to the existence of damage, not to a reasonable basis for computing the amount of damage