In re BELIZE AIRWAYS LIMITED,
Debtor.

AIR TRANSPORT LEASING, Plaintiff,

v.

BELIZE AIRWAYS LIMITED,
Defendant.

Bankruptcy No. 80–00199–BKC–SMW.
Adv. Proceeding No.
80–0108–BKC–SMW–A.

United States Bankruptcy Court,
S. D. Florida.

Nov. 24, 1980.

Burt E. Rudlus, Miami, Fla., for plaintiff.

Francis L. Carter, Michael A. Lipsky, Miami, Fla., for George Caleshu.

Timothy J. Norris, Miami, Fla., for trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

THIS MATTER was tried by the Court on October 2, 14, and 21, 1980. The Court, having heard the testimony and examined the evidence presented, having observed the candor and demeanor of the witnesses, having considered the arguments of counsel, and being otherwise fully advised in the premises, does hereby make the following findings of fact and conclusions of law.

Belize Airways Limited, the Debtor (hereinafter, "BAL"), is a corporation organized under the laws of Belize, a British colony, and has substantial assets located in the United States at Miami International Airport. BAL conducted scheduled passenger and cargo air service between Miami and points in Central America until its operational aircraft were seized by judicial process at the instance of creditors. A creditor's petition was filed against BAL on February 25, 1980, and BAL consented to the entry of an order for relief under Chapter 11 of the Bankruptcy Code. Thereafter, on April 4, 1980, William D. Seidle was appointed Trustee for the estate of BAL.

On May 9, 1980, the Plaintiff Air Transport Leasing (hereinafter, "ATL"), alleging

to be a Cayman Island corporation, filed a complaint against the Trustee to modify the stay against lien enforcement provided by Section 362 of the Bankruptcy Code. The Trustee answered and counterclaimed against ATL and two additional counterdefendants, George Caleshu and Dr. Alberto F. Smith, alleging that the Trustee was unaware of the extent and true holder of the security interest described in ATL's complaint and that, in any event, the security interest was invalid. Caleshu then filed a counterclaim and crossclaim asserting his claim to the security interest. This Court has jurisdiction of these claims and of this adversary proceeding under 28 U.S.C. Section 1471(b).

The security interest which is at the heart of this matter was created by a security agreement dated December 6, 1976, a copy of which was attached to the financing statement filed with the Florida Secretary of State on January 17, 1977 under file number 737696. The security interest was given to secure a loan of $2.5 million, and the collateral to secure the loan included five Boeing 720–022 aircraft bearing the manufacturer's serial numbers 18046, 18074, 18045, 17917, and 18076 and BAL's marks VP–HCM, VP–HCN, VP–HCO, VP–HCP, and VP–HCQ respectively. The collateral also included aircraft engines and the generic categories of collateral described in Article 9 of the Uniform Commercial Code, without any specific description of the collateral. The original secured party was Libra Bank Limited, but in May of 1978 Libra Bank's interest was assigned to Smith. In March of 1979, Smith released twenty-three jet engines from the security interest. Then, in April of 1979, BAL and Smith agreed to consolidate further debt and amend the original security agreement to specify that the amount of debt being secured had risen to nearly $5.7 million, and the amendment was filed with the Florida Secretary of State under file number 1012203.

From that point in time forward, the facts are none too clear. However, a picture has developed of an attempt in late 1979 by Caleshu to reach an understanding with Smith and to obtain financing for BAL. In December of 1979, Smith signed a number of agreements with Caleshu, who executed them as "agent for Lender". These documents, among other things, purported to "assign in blank" the security interest held by Smith to an escrow or trust pending the satisfaction of certain conditions, such as liquidating the accounts payable of BAL; none of the documents purported to assign the debt owed to Smith by BAL, and, although a copy of a promissory note from BAL to Smith was presented in evidence, no original promissory notes were presented to the Court and none of the witnesses was able to state who actually was holding the original promissory notes from BAL which were to be secured by the security interest. Likewise, the copy of the promissory note presented in evidence did not reflect an endorsement by Smith to any person, and none of the witnesses was able to recall having seen an original note or a copy reflecting any endorsement by Smith. None of the documents required Caleshu to pay Smith anything for the assignment, and in fact Smith was not paid anything by Caleshu or by ATL for the assignment.

██ As mentioned above, Caleshu executed the agreements with Smith as "agent for Lender." Caleshu explained that, at the time the documents were executed, there was no "Lender" and that he was attempting to arrange the contemplated financing. Robert Dee, who described himself as a principal of ATL, stated that ATL, which also relies upon the documents signed by Caleshu as "agent for Lender" to support its position, was the "Lender." ATL also claims its position through a Form UCC–3, the standard form used for continuations, terminations, amendments, and releases. On March 14, 1980, a Form UCC–3 was filed under file number 1133511 indicating an assignment of Smith's security interest to ATL. However, the filing of an assignment form with the Florida Secretary of State is not a substantive assignment, since the filing is only to put persons on notice; further inquiry is necessary to determine the true state of affairs. *Mills Morris Co.*

v. Scanlon (In re King-Porter Co.), 446 F.2d 722 (5th Cir. 1971); Empire Machinery Co. v. Union Rock & Materials Corp., 119 Ariz. 145, 579 P.2d 1115 (App.1978); Official Comment 2 to Section 9–402, Uniform Commercial Code. Thus, the Court concludes that the filing of the Form UCC–3 did not augment ATL's position. Based on the totality of the evidence, the Court finds that ATL was incorporated as a device to act as the "Lender" but was never utilized as such and never loaned money to BAL or paid money on its behalf. Caleshu did arrange for certain members of the Orlandini family (Beatriz, Jorge, Miguel, Vinka and Gina Orlandini) to invest in BAL, and they have invested substantial sums of money in BAL. Additionally, Caleshu assigned his interest in the security interest to the Orlandinis. Thus, to the extent anyone obtained anything by the documents signed by Smith, the Court finds that it is the Orlandinis, rather than ATL, who are the beneficiaries of the documents.*

The conditions set forth in the documents (such as liquidating the accounts payable of BAL) were not met, and in mid-February, 1980, Caleshu (who by this time had become general manager of BAL) met with Roy Smith, who had a power of attorney from Smith to deal with the security interest. Caleshu has told two different versions of what happened at that meeting, one version at several points in his deposition and one version at the trial. At the trial, Caleshu testified that Roy Smith indicated that Smith was pleased with Caleshu's efforts and plans and was releasing from escrow the documents which had been placed there. At his deposition, read at the trial, Caleshu testified that Roy Smith stated that Smith was satisfied with the efforts and plans for refinancing being made on behalf of BAL and that Smith was releasing the collateral from the security interest; Caleshu testi-

fied that he understood the release to mean that there were no longer any liens on the aircraft and that, if he could arrange financing for BAL, BAL could grant the new lender a first lien on the aircraft. Other evidence is consistent with Caleshu's deposition testimony, and the Court, based on observing the demeanor of the witness and considering the totality of the evidence, finds that Smith released the collateral from the lien of the security interest. A release or termination statement was never filed with the Florida Secretary of State, and no written release ever was obtained from Smith. That, however, does not prevent the oral release from being effective. Credit Plan, Inc. v. Hall, 9 UCC Rep. 514 (Okl.App.1971). Accordingly, the Court concludes that Smith released all the collateral from the security interest.

Even if Smith had not released the collateral, neither ATL nor Caleshu and the Orlandinis would have had a security interest in the property of the estate of BAL. The reason for this conclusion is that the debt from BAL to Smith was not assigned by Smith, the promissory note (a copy of which is in evidence) is not in the possession of either ATL or Caleshu and the Orlandinis, and there is no evidence that the promissory note ever was negotiated by Smith. It has been the law of Florida for over a century that the assignment of a chattel mortgage without the assignment of the debt secured by the chattel mortgage does not make the assignee of the chattel mortgage a mortgage creditor. Carter v. Bennett, 4 Fla. 283 (1852), app. dismissed, 56 U.S. (15 How.) 354, 14 L.Ed. 727 (1853). This rule has been followed consistently by Florida courts. For example, Vance v. Fields, 172 So.2d 613 (Fla. 1st DCA 1965), holds, at page 614, "An assignment of the mortgage without an assignment of the

---

* The Orlandinis were not joined by the Trustee as counterdefendants in his counterclaim to determine the validity, priority, and extent of lien. Before the end of the trial, the Trustee moved to amend the pleadings to conform to the evidence to join the Orlandinis as counterdefendants. A member of the Orlandini family testified at trial, as did their accountant. Evi-

dence was presented by Caleshu to show that the Orlandini family was the "Lender" and had succeeded to Caleshu's interest, and counsel for Caleshu acknowledged that he represented the Orlandinis as well. On these facts, the Court grants the Trustee's motion to join the Orlandinis as counterdefendants.

debt creates no right in the assignee." *Sobel v. Mutual Development, Inc.*, 313 So.2d 77 (Fla. 1st DCA 1975), reaches the same conclusion. This is not a mere technical legal requirement: To allow the assignee of a security interest to enforce the security agreement would expose the obligor to a double liability, since a holder in due course of the promissory note clearly is entitled to recover from the obligor. Section 3–305, Uniform Commercial Code. Furthermore, the definition of "security interest" in Section 1–201(37), Uniform Commercial Code— an interest in personal property which secures payment of an obligation—indicates that a security interest cannot exist without a debt. *See also* Section 9–504(2), Uniform Commercial Code. Accordingly, the Court concludes that neither ATL nor Caleshu and the Orlandinis hold a security interest in property of the estate of BAL by virtue of the documents signed by Smith.

Smith never filed any response to the Trustee's counterclaim and never appeared in this adversary proceeding. However, the Court finds that he was properly served with process within the means contemplated by Rule 704, Rules of Bankruptcy Procedure, by publication and by registered and first class mail addressed to him at the address on record with the Florida Secretary of State. Accordingly, Smith is in default, and the Trustee is entitled to prevail against him on the Trustee's counterclaim.

From the facts and conclusions set forth above, the Court will enter a judgment against ATL on its complaint seeking relief from the stay, since it holds no lien on the property of the estate; against Caleshu on his counterclaim and crossclaim, because he holds no lien on the property of the estate; and in favor of the Trustee and against ATL, Caleshu and the Orlandinis, and Smith, because the property of the estate was released from the security interest, because Smith defaulted, and because Smith did not assign the debt or negotiate the promissory note when he purported to assign the security interest. Because of this ruling, it is not necessary to consider other arguments made by the parties.