**In re APPLE & AT & TM AN-TITRUST LITIGATION.**

No. C 07–05152 JW.

United States District Court,
N.D. California,
San Jose Division.

Oct. 1, 2008.

---

## ORDER DENYING DEFENDANT AT & TM'S MOTION TO COMPEL ARBITRATION AND TO DISMISS; DENYING DEFENDANT AT & TM'S MOTION TO STAY DISCOVERY; GRANTING IN PART AND DENYING IN PART DEFENDANT APPLE'S MOTION TO DISMISS

JAMES WARE, District Judge.

### I. INTRODUCTION

In the cellular telephone market, it has become a common practice for an equipment manufacturer and a voice and data supply company to join together to introduce a new cellular telephone to the market. Often, to obtain a particular model of telephone at a given price from a given manufacturer, purchasers must sign a contract with the joined service provider for voice and data services of a stated period of time. This case concerns such an arrangement between Apple, Inc. and AT & T Mobility upon the introduction to the market of the iPhone. Plaintiffs allege that consumers were offered iPhones only

if they signed a two-year service agreement with AT & T Mobility. Plaintiffs allege, however, that unknown to consumers, the companies had agreed to technologically restrict voice and data service in the aftermarket for continued voice and data services, i.e., after the initial two-year service period expired. The question before the Court is whether if these allegations are true, the Complaint states a claim for a violation of the federal antitrust laws and other consumer protection laws. The Court finds that it does.

### II. BACKGROUND

Plaintiffs [1] bring this putative class action against Apple, Inc. ("Apple") and AT & T Mobility, LLC ("ATTM") (collectively, "Defendants") alleging, *inter alia*, violations of Section 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 2 and breach of warranty under the Magnuson–Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–12. In a Revised Amended Consolidated Class Action Complaint filed on June 4, 2008, Plaintiffs allege as follows:

#### The Defendants and the iPhone

Defendant Apple is a California corporation with its principal place of business in Cupertino, California. (Revised Consolidated Amended Class Action Complaint ¶ 22, hereafter, "Complaint," Docket Item No. 109.) Apple markets and sells the iPhone, which it launched on June 29, 2007. (*Id.* ¶¶ 2, 22.) The iPhone is a wireless communication device that acts simultaneously as a mobile phone, iPod, and Internet communications device. (*Id.* ¶ 27.)

Defendant ATTM is a Delaware limited liability company with its principal place of business in Atlanta, Georgia. (*Id.* ¶ 23.) ATTM is a cellular phone

---

1. Plaintiffs are Herbert H. Kliegerman, Paul Holman, Lucy Rivello, Timothy P. Smith, Mi-
chael G. Lee, Dennis V. Macasaddu, Mark G. Morikawa, Vincent Scotti, and Scott Sesso.

service provider that markets and sells the iPhone and is the exclusive provider of wire and data services to iPhone customers, pursuant to a written agreement with Apple ("The Agreement"). (*Id.* ¶¶ 2, 23, 77.) Apple and ATTM entered into the Agreement prior to the commercial release of the iPhone, making ATTM the only authorized provider of wireless voice and data services for iPhones in the United States for five years. (*Id.* ¶¶ 2, 79.)

### The Agreement

The Agreement, which lasts until 2012, provides that iPhone purchasers who want voice and data services must sign a two-year service contract with ATTM. (Complaint ¶ 30.) Although the Agreement itself is not public, some of its provisions have been revealed in the press. First, Apple and ATTM share revenue stemming from provision of voice and data services to iPhone users. (*Id.* ¶ 78.) Second, because of ATTM's position as exclusive provider of iPhone services for five years, customers will be forced to renew with ATTM, despite initially being required to agree to only a two-year contract. (*Id.* ¶ 79.) Third, Apple will enforce ATTM's exclusivity by installing SIM card program locks on all iPhones, while agreeing to never disclose the unlock codes to iPhone consumers who wish to replace the SIM cards for international travel or to lawfully cancel their ATTM contracts to switch to another carrier. (*Id.* ¶ 80.) Fourth, Apple is permitted to control the features, software, content, programming, and design of the iPhone. (*Id.* ¶ 81.) Fifth, contrary to standard industry practice, by which wireless providers subsidize the purchase of the cel-

lular device in exchange for the consumer signing a contract with the provider conditioned on payment of a fee in the event of early termination, ATTM is not required to subsidize the consumer's purchase of the iPhone, but nonetheless charges a $175 early termination fee. (*Id.* ¶¶ 82–83.) Sixth, Apple and ATTM agreed to take action, legal or otherwise, to prevent users from circumventing SIM card locks to access the services of non-ATTM providers. (*Id.* ¶ 84.) Seventh, Apple agreed to restrain from developing a CDMA[2] version of the iPhone for an unspecified period of time, which would prevent the iPhone from being used on Verizon or Sprint's networks. (*Id.* ¶ 85).

### Third–Party Applications and Software Update Version 1.1.1

Apple has created software programs for the iPhone known as "applications," such as ring tones, instant messaging, and Internet access, all of which can be downloaded by iPhone users. In addition, Apple has made agreements with some third-party software manufacturers by which Apple "approves" their applications, usually in exchange for a share of revenues resulting from sales of those applications. (Complaint ¶ 4.) Apple, however, has refused to approve any application in which it does not have a financial interest, and has told customers that it will not honor the warranties of any customer who has downloaded competing applications. (*Id.*) Nonetheless, some consumers were able to unlock their iPhones to install unapproved third-party applications ("TPAs"), as well as to use the SIM cards of wireless providers other than ATTM. (*Id.* ¶¶ 5, 89–93.)

---

2. CDMA is one of two competing wireless network technologies in the United States, the other being GSM. Of the four major American carriers, ATTM and T–Mobile are GSM carriers and Verizon and Sprint are CDMA carriers.

On September 27, 2007, Apple issued an "upgraded" version of the iPhone operating software, known as Version 1.1.1. (*Id.* ¶¶ 5, 96.) Although issued as a software update, ostensibly intended to make several changes and improvements to the iPhone operating system, Version 1.1.1 was issued by Apple for the purpose of retaliating against consumers who had unlocked their iPhones or installed unapproved TPAs. (*Id.* ¶¶ 5, 96–98, 102.) Apple knew prior to release of Version 1.1.1 that the update would "brick" (render completely inoperable) or otherwise damage some iPhones that were unlocked or which contained unapproved TPAs. This knowledge is evident by a September 24, 2007 press release in which Apple stated that downloading Version 1.1.1 "will likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed." (*Id.*) In the September 24 press release, Apple attempted to disclaim warranty liability for any damage to consumers' iPhones as a result of installing Version 1.1.1. (*Id.* ¶ 98.) The iPhones of some consumers who installed Version 1.1.1 were, in fact, damaged in the manner predicted by Apple. (*Id.*) Consumers whose iPhones were damaged as a result of installing Version 1.1.1 were then told that they had breached their warranty agreements by unlocking their phones or by downloading unapproved TPAs. (*Id.* ¶¶ 5, 104–106.)

### The Plaintiffs

The nine named Plaintiffs in this nationwide class action are residents of California, Washington, and New York. (*Id.* ¶¶ 13–21.) Each Plaintiff purchased one or more iPhones and each executed a two-year contract for provision of voice and data services with ATTM. (*Id.* ¶ 31.) Prior to Plaintiffs' purchases of their iPhones and execution of their service contracts, Defendants did not disclose to them the existence of the five-year exclusivity provision in the Agreement, or that Plaintiffs would be locked into using ATTM after the expiration of their initial two-year service contracts (*Id.* ¶ 32); disclose that Plaintiffs' iPhones were locked to only work with ATTM SIM cards or that the unlock codes would not be provided to them upon request (*Id.* ¶ 33); nor disclose that Plaintiffs would incur excessive and unconscionable roaming fees for using the iPhone's data features while traveling internationally. (*Id.* ¶ 34.) Instead, Apple's website represented to Plaintiffs that "[y]ou can browse the Internet and send emails as often as you like without being charged extra." (*Id.* ¶ 35.)

On the basis of the allegations above, Plaintiffs allege 10 causes of action:

| | Cause of Action | Defendant |
|---|---|---|
| 1 | Monopolization of the aftermarket for iPhone applications, in violation of Section 2 of the Sherman Act | Apple |
| 2 | Attempted Monopolization of the aftermarket for iPhone applications, in violation of Section 2 of the Sherman Act | Apple |
| 3 | Monopolization of the aftermarket for iPhone voice and data services, in violation of Section 2 of the Sherman Act | Apple, ATTM |
| 4 | Attempted monopolization of the aftermarket for iPhone voice and data services, in violation of Section 2 of the Sherman Act | Apple, ATTM |
| 5 | Conspiracy to monopolize the aftermarket for iPhone voice and data services, in violation of Section 2 of the Sherman Act | Apple, ATTM |

| | | |
|---|---|---|
| 6 | Unfair and deceptive trade practices in violation of the consumer protection laws of 43 jurisdictions in the United States | Apple, ATTM |
| 7 | Unlawful conditioning of the iPhone warranty on consumers' use, in connection with the iPhone, of products and services "approved" by Apple, in violation of the Magnuson–Moss Warranty Act | Apple, ATTM |
| 8 | Trespass to chattels for issuance and transmission of Version 1.1.1, knowing it would alter or damage consumers' iPhone products | Apple |
| 9 | Knowing transmission of a program, which intentionally caused damage without authorization to iPhones, in violation of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030 | Apple |
| 10 | Knowing transmission of a program, which accessed users iPhones without permission, resulting in damage to those iPhones, in violation of California Penal Code § 502 | Apple |

Presently before the Court are (1) ATTM's Motion to Compel Arbitration and to Dismiss Claims Pursuant to the Federal Arbitration Act (hereafter, "ATTM's Motion," Docket Item No. 115); (2) ATTM's Motion to Stay Discovery Pending Resolution of Its Soon–to–Be–Filed Motion to Compel Arbitration (hereafter, "Motion to Stay," Docket Item No. 104); and (3) Apple's Motion to Dismiss Revised Consolidated Amended Class Action Complaint (hereafter, "Apple's Motion," Docket Item No. 116). The Court conducted a hearing on September 12, 2008.

### III. DISCUSSION

#### A. ATTM's Motion to Compel Arbitration

Defendant ATTM moves to compel Plaintiffs to individually arbitrate its Sherman Act, Magnuson–Moss Warranty Act, and consumer protection claims brought against ATTM. (ATTM's Motion at 1.) Plaintiffs contend that ATTM's Arbitration Agreement is unconscionable and therefore unenforceable under California, Washington, and New York law.[3]

#### 1. The Arbitration Agreement

It is undisputed that Plaintiffs signed an Arbitration Agreement ("Terms of Service" or "TOS") with ATTM when they activated their ATTM voice and data services for their iPhones. (Motion to Stay, Ex. 1.)

The Arbitration Agreement provides in relevant parts:

· **"[W]e each agree to resolve … disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.** Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted.** AT & T will pay all costs of arbitration, no matter who wins, so long as your claim is not frivolous. Moreover, in arbitration you are enti-

3. Although Plaintiffs alternatively contend that California unconscionability law should be applied to all named Plaintiffs, the Court defers that issue because it finds that the Arbitration Agreement is unconscionable under all relevant state laws. (Plaintiffs' Opposition to Defendant AT & T Mobility LLC's Motion to Compel Arbitration and to Dismiss Claims Pursuant to the Federal Arbitration Act at 13–15, hereafter, "Opposition to ATTM," Docket Item No. 126.)

tled to recover attorneys' fees from AT & T to at least the same extent as you would be in court. In addition, under certain circumstances (as explained below), AT & T will pay you and your attorney a special premium if the arbitrator awards you an amount that is greater than what AT & T has offered you to settle the dispute." (emphasis in original) (*Id.* at 11–12.)

· **"You agree that, by entering into this Agreement, you and AT & T are each waiving the right to a trial by jury or to participate in a class action."** (emphasis in original) (*Id.* at 12.)

· **"YOU AND AT & T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING."** (emphasis in original) (*Id.* at 15.)

When customers purchase an iPhone in stores, they are presented with a document summarizing the activation process, available rate plans, and return policy. (Declaration of Neal S. Berinhout in Support of Motion of Defendant AT & T Mobility LLC to Compel Arbitration and to Dismiss Claims Pursuant to the Federal Arbitration Act ¶ 31, hereafter, "Berinhout Decl.," Docket Item No. 117.) Customers do not see the Arbitration Agreement until they return home with their new iPhone, connect to the Internet, and then are presented with the Terms of Service. (*Id.* ¶ 28.)

### 2. Unconscionability

Defendant ATTM moves to compel arbitration on the ground that the Arbitration Agreement is not unconscionable and is thus enforceable under the laws of California, New York, and Washington. The Court addresses each in turn.

#### a. California Unconscionability Law

Under California law, a determination of whether a class action waiver is unconscionable depends on three factors: "(1) Whether the contract is a consumer contract of adhesion, written by a party that has superior bargaining power; (2) whether the agreement occurs in a setting in which disputes between the contracting parties predictably involve small amounts of damages; and (3) whether it is alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money." *Discover Bank v. Superior Court*, 36 Cal.4th 148, 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005); *see also Shroyer v. New Cingular Wireless Services, Inc.*, 498 F.3d 976, 983 (9th Cir.2007) (holding unconscionable a prior version of ATTM's arbitration agreement under the *Discover Bank* standard). The first "procedural unconscionability" factor focuses on "oppression or surprise due to unequal bargaining power." *Stiener v. Apple Computer, Inc.*, 556 F.Supp.2d 1016, 1026 (N.D.Cal.2008) (quoting *Discover Bank*, 36 Cal.4th at 160, 30 Cal.Rptr.3d 76, 113 P.3d 1100). The second and third "substantive unconscionability" factors focus on whether the class waiver operates as an exculpatory clause. *Id.* at 1028.

The recently-decided *Stiener* case is informative to the Court's analysis in this case, because the Court finds that the Arbitration Agreement in this case is identical to the Agreement at issue in *Stiener*. In *Stiener*, a class of iPhone purchasers sued Apple and ATTM for claims relating to allegedly hidden fees associated with replacement of the iPhone's battery. *Id.* at 1020. ATTM, invoking the provisions of the Arbitration Agreement contained in

the iPhone purchasers' Terms of Service, attempted to compel the plaintiffs to individually arbitrate their disputes. *Id.* at 1017.

Judge Armstrong, however, found the Arbitration Agreement unenforceable because it was both procedurally and substantively unconscionable under *Shroyer* and *Discover Bank. Id.* at 1026–29; *see also Kaltwasser v. Cingular Wireless LLC*, 543 F.Supp.2d 1124 (N.D.Cal.2008). In doing so, Judge Armstrong relied on the Ninth Circuit's invalidation of a prior ATTM arbitration agreement in *Shroyer.*[4] *Id.* at 1018 (citing *Shroyer*, 498 F.3d at 978). Specifically, Judge Armstrong's found that (1) the Arbitration Agreement was a contract of adhesion; (2) the setting involved a small amount of damages; and (3) a scheme of deliberate cheating was alleged. *Id.* at 1024–25. Notably, Judge Armstrong also found that the incentives to arbitrate that ATTM had incorporated into the class waiver since *Shroyer* were insufficient to render the overall Agreement anything other than an exculpatory clause.[5] *Id.* at 1030–33.

The Court finds no substantive difference between the arguments in *Stiener* and those made by ATTM in this case. Although the claims in *Stiener* related to battery problems with the iPhone, and involved correspondingly lower damage claims than those alleged here, the outcome still must be the same. *Id.* at 1025. The fact that damages here are alleged to be up to $599 plus tax per plaintiff, and those in *Stiener* were only $114.95 per plaintiff, does not change the outcome in the present case. Under the California *Discover Bank* standard, damages of even $1,000 are small enough to support a finding of substantive unconscionability. *Id.* at 1024. In addition, both iPhone cases involve the allegation of post-purchase fees that were deliberately concealed by Apple and ATTM. Other than the specific underlying legal claims, therefore, there is no appreciable difference between this case and *Stiener*. Although ATTM has submitted a number of arguments that the Arbitration Agreement is enforceable, these are the same arguments ATTM advanced in *Stiener* to defend the *same agreement* it seeks to defend here.

Accordingly, the Court DENIES Defendant ATTM's. Motion to Compel Arbitration of the California Plaintiffs' claims.

**b. New York Unconscionability Law**

■ Under New York law, "a determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made." *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824, 828 (1988). The procedural element "requires an examination of the contract formation process and the alleged lack of meaningful choice." *Id.* The element of substantive unconscionability, meanwhile, "entails an analysis of the substance of the bargain to determine whether the terms were unrea-

---

4. In *Shroyer*, the Ninth Circuit found that an ATTM arbitration provision with a class action waiver operated as an exculpatory clause, even though the Agreement provided for attorney fees and arbitration costs to be paid to arbitrating consumers. 498 F.3d at 986.

5. In *Stiener*, Judge Armstrong found that newly-added incentives to arbitrate contained in ATTM's iPhone Arbitration Agreement—a pre-

mium paid to arbitrating consumers and to their attorneys under certain circumstances—could not save the Agreement. Judge Armstrong concluded that "[t]he Premium is insufficient inducement for individuals to sue, such that the class arbitration waiver operates to immunize AT & T from liability from claims suitable for class action." *Stiener*, 556 F.Supp.2d at 1030.

sonably favorable to the party against whom unconscionability is urged." *Id.,* 537 N.Y.S.2d 787, 534 N.E.2d at 829. Under New York law, arbitration contracts of adhesion may be unconscionable when a plaintiff can offer "evidence that he could not have chosen another service provider." *Ranieri v. Bell Atlantic Mobile,* 304 A.D.2d 353, 354, 759 N.Y.S.2d 448 (N.Y.App.Div.2003).

Here, as alleged, the Agreement is a contract of adhesion, with which Plaintiffs were confronted in a "take-it-or-leave-it fashion" *after* they brought their iPhones home. Presuming that Plaintiffs' allegations are true, an element of procedural unconscionability is present. (Berinhout Decl. ¶¶ 28, 31); *see also Stiener,* 556 F.Supp.2d at 1016. In addition, because ATTM was the only permissible service provider, Plaintiffs would have been charged a 10% restocking fee for the iPhone had they rejected ATTM's contract and returned their iPhones. (Complaint ¶ 57.) This is a sufficient allegation that Plaintiffs "could not have chosen another service provider." *Ranieri,* 304 A.D.2d at 354, 759 N.Y.S.2d 448. Thus, New York's procedural unconscionability requirement is met. With respect to substantive unconscionability under New York law, the manner in which the Arbitration Agreement operates as an exculpatory clause shows that "the terms were unreasonably favorable to" ATTM. *Gillman,* 537 N.Y.S.2d 787, 534 N.E.2d at 829. As discussed in the context of California law, the Arbitration Agreement is procedurally and substantively unconscionable under New York law.

Accordingly, the Court DENIES Defendant ATTM's Motion to Compel Arbitration of the New York Plaintiffs' claims.

### c. Washington Unconscionability Law

Under Washington law, an class action waiver is unconscionable if it "un-

dermines Washington's Consumer Protection Act to the extent it is injurious to the public." *Scott v. Cingular Wireless,* 160 Wash.2d 843, 853, 161 P.3d 1000 (2007). Unconscionability will be found if a contract "effectively exculpat[es] its drafter from liability for a large class of wrongful conduct." *Id.* at 854, 161 P.3d 1000. In *Scott,* the Washington Supreme Court held that a prior ATTM (then Cingular) arbitration provision was substantively unconscionable because its class action waiver was effectively an exculpatory clause. *Id.* at 854–857, 161 P.3d 1000. In addition, the court required no showing of procedural unconscionability. In so holding, the court cited *Discover Bank,* the major California precedent relied on by the Ninth Circuit in *Shroyer* and this District in *Stiener. Id.* at 855, 161 P.3d 1000. As such, Washington substantive unconscionability analysis mirrors that of California. Indeed, the agreement invalidated in *Scott* was a prior ATTM arbitration clause and class waiver that was nearly identical to the one held invalid in *Shroyer,* with both courts focusing on the exculpatory nature of the agreement. Thus, the Court finds that under Washington law, the ATTM Arbitration Agreement at issue here is similarly unconscionable.

Accordingly, the Court DENIES Defendant ATTM's Motion to Compel Arbitration of the Washington Plaintiffs' claims.

### B. *ATTM's Motion to Dismiss*

Defendant ATTM moves to dismiss Plaintiffs' claims on the ground that the Federal Arbitration Act ("FAA") preempts application of state unconscionability law to the Arbitration Agreement. (ATTM's Motion at 4–5.)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to

state a claim upon which relief may be granted against that defendant. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–534 (9th Cir.1984).

The FAA provides that written agreements to settle disputes by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

ATTM contends that state law is preempted in this instance either by the doctrines of express or conflict preemption. (ATTM's Motion at 18–20.) ATTM's preemption argument is that invalidation of ATTM's allegedly conscionable Arbitration Agreement here could only be *because it is an arbitration agreement.* ATTM contends that invalidation of the Agreement under these circumstances would violate the FAA's mandate that such agreements only be invalidated on bases that generally exist "for the revocation of any contract." 9 U.S.C. § 2. ATTM advanced the same argument in *Stiener,* and Judge Armstrong found the contention without merit. 556 F.Supp.2d at 1034–35. In *Stiener,* Judge Armstrong held that ATTM's agreement was unconscionable, and that the agreement was invalid not because it was an arbitration agreement, but because it failed to pass muster under California's generally applicable unconscionability law. *Id.* at 1035. Application of general state unconscionability laws to the Arbitration Agreement therefore neither conflicts with an express federal law, nor "stands as an obstacle" to the accomplishment of a federal objective to encourage arbitration. *See United States. v.*

*Locke,* 529 U.S. 89, 109, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000).

Accordingly, the Court DENIES Defendant ATTM's Motion to Dismiss on grounds of preemption by the Federal Arbitration Act.

## C. *ATTM's Motion to Stay Discovery*

Given that the Court has denied ATTM's Motion to Compel Arbitration and ATTM's Motion to Dismiss under the FAA, ATTM's Motion to Stay Discovery is DENIED as moot.

## D. *Apple's Motion to Dismiss*

Defendant Apple moves to dismiss all of Plaintiffs' causes of action. (Apple's Motion at 3.) The Court considers the sufficiency of Plaintiffs' factual allegations with respect to each of the claims.

### 1. Section 2 of the Sherman Act

Apple contends that Plaintiffs have not stated a claim under § 2 of the Sherman Act, because they have neither alleged legally cognizable markets under the Sherman Act, nor legally sufficient monopolization of those markets. (Apple's Motion at 1–2.)

■ Section 2 of the Sherman Act prohibits monopolization, attempted monopolization and conspiracy to monopolize "any part of the trade or commerce among the several States." 15 U.S.C. § 2. To state a valid claim under the Sherman Act, a plaintiff "must allege that the defendant has market power within a 'relevant market.'" *Newcal Industries, Inc. v. IKON Office Solution,* 513 F.3d 1038, 1044 (9th Cir.2008) (citing *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)).

### a. Relevant Markets

At issue in this case are two markets alleged by Plaintiffs: (1) an aftermarket in iPhone voice and data services and (2) an aftermarket in applications for the iPhone.

 Several factors must be considered when evaluating a plaintiff's market allegations in a motion to dismiss under Fed.R.Civ.P. Rule 12(b)(6). First, the "relevant market must be a product market," the boundaries of which are defined by products and producers. *Id.* at 1045 (citing *Brown Shoe v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Second, the market encompasses the product at issue, in addition to all reasonably interchangeable economic substitutes. *Id.* Third, an antitrust plaintiff may allege a submarket, which must be "economically distinct from the general product market." *Id.* Relatedly, a cognizable antitrust claim can be based on allegations of a "relevant market containing only a single brand of the product at issue." *Id.* at 1048.

Relying on *Eastman Kodak*, the Ninth Circuit in *Newcal* applied these principles to permit a § 2 monopolization claim where a plaintiff had alleged derivative aftermarkets for replacement parts and services for a specific brand of copy machines, where the aftermarkets were created by contract between the plaintiff and the defendant copy machine manufacturer. *Newcal*, 513 F.3d at 1049. The claim in *Eastman Kodak* had been that Kodak unlawfully forced owners of its copy machines to purchase replacement parts and services from Kodak. The claim was premised on an allegation that Kodak held market power in a market "consisting of those customers that had already purchased Kodak-brand equipment and that needed replacement parts and services for that particular equipment," giving Kodak a natural monopoly in the derivative services

market. *Id.* at 1048 (discussing *Eastman Kodak*, 504 U.S. at 456–59, 112 S.Ct. 2072). Notably, there was no claim that Kodak held market power in the predicate market for copiers themselves. The Supreme Court held that the claimed aftermarket was legally cognizable. *Eastman Kodak*, 504 U.S. at 462–63, 112 S.Ct. 2072.

Similarly, in *Newcal*, the plaintiff's claim related only to an aftermarket for copier parts and services, and not to the primary market for the copiers themselves. *Newcal*, 513 F.3d at 1050. Specifically, the *Newcal* plaintiff claimed that the defendant had an original contract-created monopoly in the derivative services aftermarkets for its copiers, which it then exploited to gain further monopoly power that was not contractually created. *Id.* In finding such aftermarkets legally cognizable, the Ninth Circuit placed a strong emphasis on the fact that "the market for replacement copiers and lease-end services would not exist without the [primary] market for copier leases and services," and was thus, "wholly derivative from and dependant on the primary market." *Id.* at 1049.

In so holding, the Ninth Circuit distinguished two cases in which courts found that contractual creation of a monopoly in an aftermarket prevented that aftermarket from being legally cognizable under the Sherman Act. *Id.* at 1046–50 (distinguishing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir.1997) (aftermarket for pizza ingredients and restaurant supplies created by a pizza franchise contract); *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir.1997) (aftermarket for use of specified hospitals created by an insurance contract)). In both cases, plaintiffs alleged monopolization in aftermarkets, the boundaries of which were created by written contracts between the plaintiffs and the defendants. Both instances involved contracts wherein the plaintiffs obli-

gated themselves to make certain purchases exclusively from the defendants. According to the Ninth Circuit, the fundamental distinction between *Newcal*, on one hand, and *Forsyth* and *Queen City Pizza*, on the other, was that the aftermarkets alleged in the latter cases for pizza supplies and hospital services were in no way dependent on the primary markets for pizza franchises and health insurance, respectively. *Id.* at 1049. The fact of critical significance that rendered the aftermarket *Newcal* akin to the one in *Eastman Kodak*, therefore, was that it was "wholly dependent" on the primary market. *Id.* Thus, according to the *Newcal* analysis, there can be a legally cognizable aftermarket in a single brand's products, even if that market is created by a contractual relationship.

### i. Voice and Data Services Aftermarket

■ Apple moves to dismiss on the ground that there is no relevant aftermarket for iPhone voice and data services. (Apple's Motion at 11.)

Plaintiffs allege that:

iPhone purchasers "agreed to enter into a two-year voice and/or data service plan with ATTM" and "did not agree to use ATTM for five years," even after the expiration of their initial contracts. (Complaint ¶¶ 2, 31.) In addition, Apple and ATTM enforced this exclusivity by programming and installing software locks on each iPhone to prevent purchasers from later switching to another wireless carrier. (*Id.* ¶¶ 3, 33.) Consumers were bound for the full five years of the Agreement between Apple and ATTM, and were technologically prevented from switching carriers, even if they paid ATTM's $175 termination fee prior to the end of their initial contracts. (*Id.* ¶¶ 2–3, 32–33, 83.)

The allegations in the Complaint recite facts, which, if presumed to be true, would support the existence of an aftermarket for iPhone voice and data services, under the standard articulated by the Ninth Circuit in *Newcal*. Principally, Plaintiffs have alleged an aftermarket for iPhone voice and data services that "would not exist without" the primary market for iPhones, and is thus "wholly derivative from and dependant on the primary market." *Newcal*, 513 F.3d at 1049. Plaintiffs' Complaint is also adequate to the extent the alleged aftermarket is predicated on an initial contractual relationship between Defendants and iPhone purchasers. *Id.* Even though Apple rightly contends that Plaintiffs entered into two-year ATTM service contracts at the time of purchase, Plaintiffs allege that the aftermarket includes the full five-year period during which they are bound to use ATTM voice and data services, including the three years after the initial contract expiration, which is enforced by both technological and contractual means.

Apple also contends that there is no aftermarket because "the iPhone purchase and ATTM service agreement were both part of the *initial foremarket transaction*, and all iPhone purchasers still remain under the two-year ATTM service contracts to which they agreed when they first bought an iPhone." (Apple's Reply Brief in Support of Motion to Dismiss at 5, hereafter, "Apple's Reply," Docket Item No. 137 (emphasis in original).) Plaintiffs' Complaint, however, alleges that the consumers have suffered a present injury even if they have not attempted to switch service. It is alleged that iPhone purchasers "agreed to enter into a two-year voice and/or data service plan with ATTM" and "did not agree to use ATTM for five years," after the expiration of their initial contracts. (Complaint ¶¶ 2, 31.) These allegations state a claim which is ripe for

adjudication because Plaintiffs are alleging that at the point of purchase and initiation of service, Defendants involuntarily impose on consumers a contract exclusivity restriction which restricts their freedom from that point forward for at least the next five years and conceivably for the life of the iPhone. Even though consumers might sign a two-year service contract, they own the iPhone and are free to terminate service with ATTM, subject, of course, to having to fulfil any financial commitment which they have made to it. The fact that some consumers might not have sought to switch service and thus do not realize the restriction which the Apple/ATTM Agreement has imposed on them does not alter the effect of Plaintiffs' allegation that their freedom in the aftermarket has already been taken from them.

Under *Newcal*, Plaintiffs have sufficiently alleged an aftermarket in iPhone voice and data services sufficient to state a claim under § 2 of the Sherman Act.

### ii. The iPhone Applications Aftermarket

■ Apple moves to dismiss on the ground that there is no relevant aftermarket for iPhone applications. (Apple's Motion at 11.)

Plaintiffs allege that:

iPhone-specific TPAs began to appear immediately after the iPhone was launched. (Complaint ¶ 87.) Apple created a number of iPhone-specific applications itself, sold ring tones from the iTunes Store, and also had revenue-sharing arrangements with approved TPA software manufacturers. (*Id.* ¶¶ 4,

88–90.) Additionally, Apple built technological restrictions into the iPhone, and policed its restrictions on unapproved TPAs by damaging iPhones and downloaded TPAs through the guise of software update Version 1.1.1. (*Id.* ¶¶ 4–5, 94–103.)

Plaintiffs have alleged an aftermarket for iPhone applications that "would not exist without" the primary market for iPhones, and is thus "wholly derivative from and dependant on the primary market." *Newcal*, 513 F.3d at 1049. The allegations in the Complaint recite facts, which, if presumed to be true, would support the existence of an aftermarket for iPhone applications, under the standard articulated by the Ninth Circuit in *Newcal*.

Apple contends that there is no such aftermarket because (1) Apple does not sell or make any add-on applications and (2) that the array of differing applications for the iPhone could not possibly make up a single relevant market. (Apple's Motion at 13.)[6] Apple further contends that because Apple has now opened up the iPhone to TPAs, Plaintiffs' claims as to the applications aftermarket are moot.[7] (Apple's Reply at 9.) Plaintiffs, however, have alleged that Apple enforced entry into the Applications Aftermarket, and limited access to software applications in which it maintained a financial interest.

Under *Newcal*, Plaintiffs have sufficiently alleged a relevant aftermarket in iPhone applications sufficient to state a claim under § 2 of the Sherman Act.

### b. Market Power

■ To sustain an antitrust claim, a plaintiff must allege that the defendant

---

6. A determination of whether the "applications aftermarket" should appropriately be split into more specific sub-markets is a factual issue more appropriate for determination at a later state in this litigation.

7. Plaintiffs have alleged injury, however, for the period before Apple opened up the iPhone to TPAs. In addition, the extent to which Apple has opened up the applications aftermarket is not clear from the pleadings or the parties' papers.

possesses power in the relevant market. *Id.* at 1046. There can be no legally cognizable antitrust claim, however, where there is a claim of "market *power* that arises solely from contractual rights that consumers knowingly and voluntarily give to the defendant." *Id.* at 1048 (emphasis in original). According to the Ninth Circuit, whether a consumer *knowingly* places a defendant in a monopoly position in an aftermarket is "[t]he critical distinction" between *Eastman Kodak* and the paired cases of *Queen City Pizza* and *Forsyth.* *Id.* In *Eastman Kodak,* copier purchasers could not, at the time of purchase, reasonably determine that Kodak monopolized the aftermarkets for replacement parts and services for its brand copiers. *Eastman Kodak,* 504 U.S. at 473–78, 112 S.Ct. 2072.

In applying the lessons of *Eastman Kodak,* the *Newcal* Court found two aspects of the plaintiffs' complaint relevant to whether there was a legally cognizable claim of market power. First, the defendant did not "achieve market power through contractual provisions that it obtain[ed] in the initial market [for copiers]." *Id.* at 1050. Rather, the initial contract gave the defendant "special access to its consumers," by which it was later able to induce those consumers into purchasing aftermarket equipment and services from the defendants. *Id.* Second, the complaint alleged market imperfections such as information and switching costs, along with fraud and deceit on the part of the defendants, so as to "prevent consumers from realizing that their choice in the initial market will limit their freedom to shop in the aftermarket." *Id.* In other words, "[c]ompetition in the initial market ... does not necessarily suffice to discipline anticompetitive practices in the aftermarket." *Id.* As such, the Court held that no *per se* rule exists against recognition of contractually created submarkets. *Id.*

### i. Market Power in the Voice and Data Services Aftermarket

 Apple moves to dismiss on the ground that Plaintiffs have made no legally cognizable claim of market power in the alleged voice and data services aftermarket. (Apple's Motion at 11.)

Plaintiffs allege that:

Defendants had not disclosed that Defendants had a five-year exclusive service provider agreement or that Defendants' five-year agreement would effectively lock Plaintiffs into using ATTM as their voice and data service provider even after their two-year contracts expired. (Complaint ¶ 32.) In addition, Defendants did not disclose the SIM card locks on each iPhone or the extent of the roaming fees iPhone users would incur during or after the expiration of their two-year contracts. (*Id.* ¶¶ 33–34.)

In other words, Plaintiffs have alleged that Defendants "achieve[d] market power through contractual provisions that they obtain[ed] in the initial market" for iPhones and attendant two-year service contracts. *Newcal,* 513 F.3d at 1050. Through the initial iPhone purchase and contracting, Defendants are alleged to have gained the "special access" to consumers by which they are then able to lock purchasers into use of ATTM. *Id.* In addition, the Complaint has alleged the types of information costs relating to the iPhone that caused concern for the Ninth Circuit in *Newcal.* Ultimately, the dispositive issue is whether Plaintiffs "knowingly placed [Defendants] in a monopoly position" in the alleged voice and data services aftermarket. *Id.* at 1049. Apple's contention is that Plaintiffs' market power and monopolization allegations fail because "inadequate disclosure does not result in aftermarket monopoly power" (Apple's Reply at

6.) The fact that Apple disputes whether Plaintiffs "knowingly placed [Apple] in a monopoly position" merely creates a factual dispute better suited for resolution at a later stage of this litigation.

In sum, the Court finds Plaintiffs have sufficiently alleged market power and monopolization in the iPhone voice and data services aftermarket, which, taken with Plaintiffs' market allegations, is sufficient to state a claim for violation of § 2 of the Sherman Act.

Accordingly, the Court DENIES Apple's Motion to Dismiss Plaintiffs' antitrust claims relating to the iPhone voice and data services aftermarket.

### ii. Market Power in the iPhone Applications Aftermarket

 Apple moves to dismiss on the ground that Plaintiffs have made no legally cognizable claim of market power or monopolization in the alleged iPhone applications aftermarket. (Apple's Motion at 11.)

Plaintiffs allege that:

Plaintiffs were unaware of Apple's policies barring TPAs when they entered into their iPhone purchase contracts. (Complaint ¶¶ 4, 7.) Apple maintained complete control over which applications were made available for the iPhone. (*Id.* ¶¶ 4–5.) Additionally, Apple built technological restrictions into the iPhone, and policed its restrictions on unapproved TPAs by damaging iPhones and downloaded TPAs through the guise of software update Version 1.1.1. (*Id.* ¶¶ 4–5, 94–103.)

 As discussed, *supra*, a monopolization claim can proceed where it is alleged that a plaintiff did not "knowingly and voluntarily" place the defendant in a monopoly position. Through the initial iPhone purchase and contracting, Apple is alleged to have gained the "special access" to consumers by which it is then able to lock consumers into use of only applications in which Apple maintained a financial interest. *Newcal*, 513 F.3d at 1050. Apple is then alleged to have enforced its special position through technological controls and the issuance of software update Version 1.1.1.

In sum, Plaintiffs have sufficiently alleged market power and monopolization in the iPhone voice and data services aftermarket, which, taken with Plaintiffs' market allegations, is sufficient to state a claim for violation of § 2 of the Sherman Act.

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' antitrust claims relating to the iPhone applications aftermarket.

### 2. Computer Trespass

 Apple moves to dismiss Plaintiffs' trespass to chattels claim on the grounds that (1) Plaintiffs allege no "intrusion" sufficient to constitute trespass and (2) Plaintiffs' trespass claim is vitiated by consent. (Apple's Motion at 15–16.) The Court considers each contention in turn.

 Common law trespass "lies where an intentional interference with the possession of personal property has proximately caused injury." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1069 (N.D.Cal.2000) (quoting *Thrifty–Tel v. Bezenek*, 46 Cal.App.4th 1559, 1566, 54 Cal. Rptr.2d 468 (1996)).

With respect to their computer trespass claim, Plaintiffs allege as follows:

Apple "acted deliberately and intentionally to destroy the iPhones of consumers who had unlocked their iPhones." (Complaint ¶ 97.) Version 1.1.1 contained codes targeted at the unlocked iPhones that were not necessary to the stated purposes of Version 1.1.1. (*Id.* ¶¶ 102–03.) Plaintiffs' iPhones were damaged or disabled as a result of

downloading Version 1.1.1. (*Id.* ¶¶ 47, 49, 56.)

Apple contends, however, trespass law only applies to computer systems where there is an "uninvited intrusion" into a plaintiff's computer (i.e., through "spamming"), such that trespass can never lie as the result of a willful download. (Apple's Motion at 15.) Although Apple cites cases where a defendant did make an "uninvited intrusion" into a plaintiff's computer system, those cases do not, as a matter of law, foreclose a trespass claim incident to a software download. *See eBay,* 100 F.Supp.2d 1058; *Intel Corp. v. Hamidi,* 30 Cal.4th 1342, 1 Cal.Rptr.3d 32, 71 P.3d 296 (2003). Rather, there must be an "intentional interference with the possession of personal property" to find a trespass. *eBay,* 100 F.Supp.2d at 1069. As discussed, Plaintiffs here allege that Apple intentionally damaged their iPhones via its dissemination of Version 1.1.1. Plaintiffs therefore allege facts to support a claim of trespass sufficient to survive a motion to dismiss.

Whether Plaintiffs' trespass claim can be permitted to proceed, however, depends on whether Plaintiffs consented to the alleged trespass when they downloaded Version 1.1.1, despite being first confronted with a warning that stated "IF YOU HAVE MODIFIED YOUR IPHONE'S SOFTWARE, APPLYING THIS SOFTWARE-UPDATE MAY RESULT IN YOUR IPHONE BECOMING PERMANENTLY INOPERABLE." (Apple's Motion at 14–15.)

 "Where there is a consensual entry, there is no tort, because lack of consent is an element" of a trespass claim. *Civic Western Corp. v. Zila Industries, Inc.,* 66 Cal.App.3d 1, 16–17, 135 Cal.Rptr. 915 (1977). Consent can be limited by its scope, however, and "creates a privilege to [enter] only in so far as [a] condition or restriction is complied with." *Id.* at 17, 135 Cal.Rptr. 915.

Plaintiffs contend that the scope of their consent was limited to installation of Version 1.1.1, which they allege was "intended to make limited specific changes and improvements including ... a needed and substantial improvement to the power management and battery life of [the] iPhone." (Plaintiffs' Opposition at 24; Complaint ¶ 102.) Plaintiffs also allege that some customers "unsuspectingly downloaded Version 1.1.1." (Complaint ¶ 103.) The Court takes this to mean that, even if these consumers had given nominal consent pursuant to Apple's warning, they were not aware of what they were consenting to. In addition, there is some ambiguity in Apple's warning that may also serve to vitiate Plaintiffs' consent. The warning says that "if you have modified your iPhone's software," permanent inoperability "may" result from installing Version 1.1.1. Under these circumstances, Plaintiffs' claims cannot conclusively be dismissed on consent grounds, as a matter of law.

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' trespass to chattels claim.

### 3. Computer Fraud

Apple moves to dismiss Plaintiffs' computer fraud claims under (1) the federal Computer Fraud and Abuse Act ("CFAA") and (2) California Penal Code § 502(c)(8). The Court considers each contention in turn.

#### a. Computer Fraud Abuse Act

 Apple contends that Plaintiffs' CFAA claim fails because (1) Plaintiffs fail to allege the requisite intent required by the CFAA; (2) Plaintiffs authorized the installation of Version 1.1.1; and (3) Plaintiffs fail to allege the $5,000 minimum in

damages required by the CFAA. (Apple's Motion at 16–18.)

The CFAA provides for liability for "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A)(i). A plaintiff must also demonstrate that the defendant's action caused over $5,000 in damage over a one-year period. *Id.* at § 1030(a)(5)(B)(i).

With respect to their computer fraud claims, Plaintiffs allege as follows:

> Apple specifically intended to disable iPhones that contained unapproved program unlocks. (Complaint ¶ 99.) Apple was aware of the potential ramifications of Version 1.1.1 prior to its release and none of the damaging aspects of Version 1.1.1 were necessary to effectuate Apple's stated intent in releasing that software upgrade. (*Id.* ¶¶ 98–103.) Plaintiffs authorized a software update, but did not authorize damage to their iPhones. (*Id.* ¶¶ 102–03.)

Plaintiffs allege more than that Apple had "knowledge of a potential but unintended result." (Apple's Motion at 17.) Contrary to Apple's contention, therefore, Plaintiffs have adequately alleged the requisite intent to satisfy a motion to dismiss under Rule 12(b)(6).

Plaintiffs' contentions regarding their lack of "authorization" are also sufficient to state a claim under the CFAA. As discussed in the Computer Trespass subsection, *supra*, Plaintiffs have alleged that they authorized a software update, not that they authorized damages to their iPhones. Given the ambiguity surrounding Apple's warning and the fact that Plaintiffs allege that some downloading of Version 1.1.1 was "unsuspected," Plaintiffs allegations are sufficient to defeat Apple's motion to dismiss.

■ Finally, the Court rejects Apple's contentions that Plaintiffs' CFAA claims are barred on ground that they have not adequately pleaded the $5,000 minimum in damages. Apple contends that Plaintiffs are not permitted to aggregate damage to their individual iPhones to reach the $5000 jurisdictional minimum because damages to multiple computers cannot be aggregated under the CFAA. (Apple's Motion at 18.) In *In re Toys R Us, Inc. Privacy Litigation,* however, Judge Chesney permitted a class of plaintiffs to aggregate damages to their individual computers where it was alleged that the "defendants caused an identical file to be implanted in each of the plaintiffs' computers, resulting in damages of a uniform nature." 2001 WL 34517252, *11 (N.D.Cal.2001). In *Toys R Us,* the allegation was that the defendants had caused a damaging "cookie" to be implanted in multiple plaintiffs' computers. The court permitted the plaintiffs' CFAA claims to proceed. *Id.* Thus, the Court is persuaded by the holding of *Toys R Us,* as it found that the legislative history of the CFAA revealed that Congress intended to permit aggregation of damages, so long as those damages arose from the same act by a defendant. *Id.* The Court therefore permits Plaintiffs to aggregate their individual damages to reach the $5,000 threshold.

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' CFAA claim.

**b. California Penal Code §§ 502(c)(4) and 502(c)(8)**

■ The California Penal Code ("CPC") permits an action against an individual who "[k]nowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a com-

puter." CPC § 502(c)(4). In addition, the CPC allows an action against an individual who "[k]nowingly introduces any computer contaminant into any computer, computer system, or computer network." *Id.* § 502(c)(8). Under the CPC, a "computer contaminant" is defined as "computer instructions that are designed to ... damage [a computer] ... without the intent or permission of the owner." *Id.* § 502(b)(10).

Apple's contentions here mirrors its arguments relating to Plaintiffs' trespass and computer fraud claims. Namely, Apple contends that the Complaint insufficiently alleges that Apple designed and released Version 1.1.1 with the intent that it visit damage on Plaintiffs' iPhones, and that Plaintiffs' authorized introduction of Version 1.1.1 onto their iPhones. (Apple's Motion at 18.) For the reasons discussed in those prior sections, *supra,* Plaintiffs have sufficiently alleged knowledge and intent on the part of Apple, as well as their own insufficient consent.

Accordingly, the Court DENIES Apple's Motion to Dismiss Plaintiffs' claims under California Penal Code § 502.

### 4. Unfair and Deceptive Trade Acts and Practices

Apple moves to dismiss Plaintiffs' consumer protection claims on the grounds that (1) Plaintiffs lack standing to pursue claims under the laws of the forty states where no named plaintiffs reside; (2) the claims, which rely on allegations of fraudulent omission or concealment, fail to meet the heightened pleading test of Federal Rule of Civil Procedure 9(b); and (3) Plaintiffs have failed to state a claim under the laws of the three states in which named Plaintiffs reside, California, Washington, and New York. (Apple's Motion at 19.) The Court considers each contention in turn.

#### a. Standing

Apple contends that Plaintiffs lack standing to bring consumer protection claims in the forty states where no named Plaintiff resides. (Motion at 19–20.)

A demonstration of standing requires that "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey,* 518 U.S. 343, 347, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). This standing predicate was recently addressed in two antitrust class action cases in this District. In *In re Ditropan XL Antitrust Litig.,* plaintiffs were denied standing to bring claims based on the laws of states in which no named plaintiffs resided. 529 F.Supp.2d 1098, 1107 (N.D.Cal. 2007); *see also In re Graphics Processing Units Antitrust Litig.,* 527 F.Supp.2d 1011 (N.D.Cal.2007). As is the case here, Judge White in *Ditropan* addressed the issue of standing prior to class certification. *Id.* (citing *Easter v. American West Financial,* 381 F.3d 948, 962 (9th Cir.2004)).

Since named Plaintiffs here only reside in California, New York, and Washington, but have alleged violations of the consumer protection laws of forty-two states and the District of Columbia, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' consumer protection claims for all jurisdictions except for California, New York, and Washington.

#### b. Application of Federal Rule of Civil Procedure 9(b)

Apple contends that Plaintiffs' consumer protection claims must meet the heightened pleading requirement of Rule 9(b), because these claims are based on Apple's alleged failure to disclose and fraudulent concealment of facts in connec-

tion with Plaintiffs' iPhone purchases. (Apple's Motion at 20–21; Apple's Reply at 12.)

 Fed.R.Civ.P. Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Allegations under Rule 9(b) must be stated "specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir.2007); *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994). The pleading must be "specific enough to give defendants notice of the particular misconduct … so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.2003) (internal quotation omitted). Where the claim is one of fraud by omission, however, the pleading standard is lowered on account of the reduced ability in an omission suit "to specify the time, place, and specific content" relative to a claim involving affirmative misrepresentations. *Falk v. General Motors Corp.*, 496 F.Supp.2d 1088, 1099 (N.D.Cal.2007).

Here, Plaintiffs do not contest that their allegations are governed by the requirements of Rule 9(b). Plaintiffs allegations of material omissions on the part of Defendants include the following:

> Non-disclosure (1) of the five-year exclusivity agreement between Apple and ATTM, the result of which was that consumers would be locked into ATTM service beyond their initial contract terms; (2) that iPhone SIM cards were locked; (3) that SIM card unlock codes would not be provided to iPhone owners; (4) that Apple would seek to limit iPhone owners' use of unapproved TPAs; and (5) the extent of the international roam-

ing fees associated with international use of the iPhone. (Complaint ¶ 7.)

Since these are allegations of fraudulent omissions, Plaintiffs failure to specify the time and place of the omissions will not bar their claims. *Falk*, 496 F.Supp.2d at 1099. Plaintiffs have, however, pleaded the content of the omissions, the identity of the parties responsible for the omissions, and the injuries resulting from the omissions with sufficient particularity to survive Rule 9(b) scrutiny.

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' consumer protection claims on ground of failure to plead fraudulent omission with sufficient particularity.

#### c. Plaintiffs' Claims Under California Consumer Protection Laws

Apple contends that Plaintiffs fail to state a cause of action under the California Unfair Competition Law ("UCL") and the California Consumer Legal Remedies Act ("CLRA"). Cal. Bus. & Prof.Code §§ 17200, 17500; Cal. Civ.Code § 1770(a)(19).

##### i. The CLRA

 The CLRA prohibits "[i]nserting unconscionable provisions in contracts." Cal. Civ.Code § 1770(a)(19). Liability under the CLRA for an omission can result when a defendant has a "duty to disclose" potential problems with a product in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact. *Falk*, 496 F.Supp.2d at 1095. Materiality depends on a plaintiff showing that "had the omitted information been disclosed," a reason-

able consumer "would have been aware of it and behaved differently." *Id.* at 1094.

■ In this case, Plaintiffs adequately allege that Defendants "had exclusive knowledge of material facts not known" to Plaintiffs.[8] *Id.* at 1095. As discussed, *supra,* Plaintiffs allege that Defendants failed to disclose numerous legal and technical limitations associated with the iPhone. Plaintiffs Complaint alleges a number of consumer expectations in the cellular industry relating to the abilities of consumers to unlock SIM cards and for cellular providers to provide unlock codes. (Complaint ¶¶ 42, 70.) The Complaint does not, however, allege facts supporting the claim that a reasonable consumer "would have behaved differently." The Complaint merely alleges that a number of the named Plaintiffs now would like to unlock their iPhones or switch service providers, and does not allege that those Plaintiffs would have made a different product choice at the outset. (*Id.* ¶¶ 37, 39, 44–48, 51.) Plaintiffs have thus not pleaded a "duty to disclose" under the CLRA.

Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' CLRA claim with leave to amend to plead facts consistent with this Order.

### ii. The UCL

■ The UCL is a broad statute that defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof.Code § 17200. Similarly, "false and misleading advertising" is also proscribed. *Id.* § 17500. Given the sweep of the statute, a "practice may be deemed

unfair even if not specifically proscribed by some other law." *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). There can thus be a violation of the UCL if a business practice was unlawful, unfair, or fraudulent. A business practice is unfair if "it offends established public policy ... or is substantially injurious to consumers." *People v. Duz–Mor Diagnostic Laboratory,* 68 Cal. App.4th 654, 658, 80 Cal.Rptr.2d 419 (1998). Finally, a business practice is fraudulent under the UCL if a plaintiff can show that "members of the public are likely to be deceived." *Bardin v. Daimlerchrysler Corporation,* 136 Cal.App.4th 1255, 1261, 39 Cal.Rptr.3d 634 (2006).

Plaintiffs' claim is that Apple violated the UCL by violating the CLRA. (Plaintiffs' Opposition at 20). As discussed above, Plaintiffs' pleading is inadequate to sustain a claim under the CLRA. Plaintiffs' UCL claim therefore must also fail. This is true under either the unlawfulness, unfairness, or fraudulence prongs of the UCL. In *Falk,* Judge Alsup permitted a plaintiff's UCL claims under all three prongs, only because the plaintiff had adequately pleaded a duty to disclose under the CLRA as a predicate. 496 F.Supp.2d at 1098. Therefore, to the extent Plaintiffs allege a UCL violation based on the same behavior alleged to underlie Plaintiffs' CLRA claim, Plaintiffs have not pleaded facts sufficient to state a claim under the UCL.

Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' claims under the California UCL, with leave to amend to plead facts consistent with this Order.

8. The parties' dispute over whether Plaintiffs were aware of the alleged omissions or whether Defendants were in exclusive possession of the relevant material facts is a factual

dispute more suited to resolution at a later point in this litigation. For the purposes of this Motion to Dismiss, Plaintiffs' allegations that Apple never disclosed those facts suffices.

**1312**

#### d. Washington Consumer Protection Act

■ Apple contends that Plaintiffs fail to state a cause of action under the Washington Consumer Protection Act ("WCPA"), Wash. Rev.Code § 19.86.020, on the ground that the Complaint fails to adequately plead the required causation element. (Apple's Motion at 23–24.)

■ Under the WCPA, a plaintiff must prove five distinct elements: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wash.2d 778, 780, 719 P.2d 531 (1986). In *Hangman Ridge,* the Washington Supreme Court held that the "need to find a causal link between the alleged acts and the plaintiff's injury" is essential to a WCPA claim. *Id.* at 793, 719 P.2d 531.

■ Under the WCPA, the causation element operates in the same manner as the materiality requirement for omissions under the CLRA, in that liability under both is predicated on whether a consumer "would have ... behaved differently." *Falk,* 496 F.Supp.2d at 1094. As discussed above, Plaintiffs make no allegations that their choice to purchase an iPhone and enroll in ATTM's service plan would have been different had Defendants made the relevant disclosures. Therefore, for the reasons articulated in the CLRA section, *supra,* Plaintiffs fail to state a claim under the WCPA.

Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' claims under the WCPA, with leave to amend to plead additional facts consistent with this Order.

#### e. New York Consumer Protection Act

■ Apple contends that Plaintiffs fail to state a cause of action under the New York Consumer Protection Act ("NYCPA"). Gen. Bus. L. § 349.

■ To state a claim under the NYCPA, a plaintiff must allege "an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (N.Y.1995). Actual harm must be caused by a defendant's material deceptive act or practice. *Small v. Lorillard Tobacco Co., Inc.,* 94 N.Y.2d, 43, 56, 698 N.Y.S.2d 615, 720 N.E.2d 892 (N.Y.1999).

As discussed, *supra,* Plaintiffs do not allege that Defendant's alleged material omissions were the actual cause of the harm they claim to have suffered. Nowhere in the Complaint is an allegation that any of the Plaintiffs would not have bought an iPhone if armed with the knowledge Defendants' are alleged to have withheld. Plaintiffs therefore fail to state a claim under the NYCPA.

Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' claims under the NYCPA, with leave to amend to plead additional facts consistent with this Order.

#### 5. Magnuson–Moss Warranty Act

Apple moves to dismiss Plaintiffs' Magnuson–Moss Warranty Act ("MMWA") claims on the grounds that (1) the Complaint did not allege prohibited "conditioning" under the MMWA and (2) Apple made disclosures regarding Plaintiffs' iPod warranties as required by the MMWA. 15 U.S.C. §§ 2301, *et seq.*

#### a. Warranty Conditioning Under the MMWA

██ Under the MMWA, "[n]o warrantor of a consumer product may condition its written or implied warranty of such product on the consumer's using, in connection with such product, any article or service (other than article or service provided without charge under the terms of the warranty) which is identified by brand, trade, or corporate name." 15 U.S.C. § 2302(c).

The Complaint alleges in relevant part that:

Apple "[told] customers that Apple will void and refuse to honor the iPhone warranty of any customer who has downloaded competing applications." (Complaint ¶ 4.) As a result of installing unlocking software for the specific purposes of using non-ATTM SIM cards and unapproved TPAs on their iPhones, their phones were damaged or disabled when Apple subsequently released software update Version 1.1.1. (*Id.* ¶¶ 5-6, 47, 56, 94.) Apple refused to honor the warranties of customers whose iPhones had been damaged as a result of downloading Version 1.1.1 after previously installing the unapproved software. (*Id.* ¶¶ 5,7, 94–95, 104.)

Plaintiffs' Complaint thus alleges sufficient facts to state a claim under § 2302(c), because it alleges that Apple refused to honor the warranties of customers who used iPhone applications and cellular service not approved by Apple.

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' MMWA claims under 15 U.S.C. § 2302(c).

#### b. Warranty Disclosure Under the MMWA

██ The MMWA requires that a warrantor make a "full and conspicuous disclosure of the terms and conditions" of a warranty. 15 U.S.C. § 2302(a). Magnuson–Moss requires warrantors to "clearly and conspicuously disclose [warranty terms] in a single document in simple and readily understood language." *Cunningham v. Fleetwood Homes of Ga., Inc.*, 253 F.3d 611 (11th Cir.2001) (quoting 16 C.F.R. § 701.3(a)).

Plaintiffs' primary allegation in support of their claim under § 2302(a) is that Defendants did not "fully and conspicuously disclos[e] that they would not honor the warranty as to iPhone that were damaged and destroyed by Apple's Version 1.1.1 operating system upgrade." (Complaint ¶ 160.) Apple, however, contends that Plaintiffs' claim fails because their original warranty expressly did not apply "to a product or part than has been modified to alter functionality or capability." (Apple's Reply at 14.) Plaintiffs' contention, however, is that the alleged iPhone damage was as a result of Apple's issuance of Version 1.1.1, not as a result of Plaintiffs' installation of unapproved software on their iPhones. As such, Plaintiffs are claiming that Apple's warranty never stated that it would not cover damage as a result of installation of Apple's own software updates. The fact that, as both parties agree, Apple issued a press release in advance of Version 1.1.1 that disclaimed warranty liability for iPhone damage resulting from installation of Version 1.1.1 is of no moment to the permissibility of Plaintiffs' claims, because such a later disclaimer runs afoul of the single document rule. 16 C.F.R. § 701.3(a).

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' MMWA claims under 15 U.S.C. § 2302(a).

#### IV. CONCLUSION

The Court DENIES ATTM's Motion to Compel Arbitration, DENIES ATTM's Motion to Dismiss, and DENIES ATTM's

Motion to Stay Discovery. The Court GRANTS in part and DENIES in part Apple's Motion to Dismiss, as follows:

(1) The Court DENIES Apple's Motion to Dismiss all of Plaintiffs' Sherman Act claims;

(2) The Court DENIES Apple's Motion to Dismiss Plaintiffs' computer trespass claim;

(3) The Court DENIES Apple's Motion to Dismiss all of Plaintiffs' computer fraud claims;

(4) The Court GRANTS Apple's Motion to Dismiss Plaintiffs' unfair and deceptive trade practices claims for all jurisdictions except California, Washington, and New York;

(5) The Court GRANTS Apple's Motion to Dismiss Plaintiffs' unfair and deceptive trade practices claims under California, Washington, and New York law, with leave to amend;

(6) The Court DENIES Apple's Motion to Dismiss Plaintiffs' Magnuson–Moss Warranty Act claims.

Any Amended Complaint shall be filed on or before **October 15, 2008.** If no Amended Complaint is filed by the specified date, Defendants shall file and serve their Answers on or before **October 30, 2008.**

The parties shall appear for a Case Management Conference on **November 17, 2008 at 10 a.m.** The parties shall meet and confer and file a Joint Case Management Statement on or before **November 7, 2008.** The Statement shall, among other things, set forth a good faith discovery plan, including a proposed date for the close of all discovery.